# WASHINGTON SUBURBAN SANITARY COMMISSION ET AL. *v.* TKU ASSOCIATES ET AL.

[No. 6, September Term, 1976.]

\* \* \*

# A. ALFRED TAUBMAN ET AL. T/A TKU ASSOCIATES ET AL. *v.* MONTGOMERY COUNTY, MARYLAND ET AL.

[No. 133, September Term, 1976.]

*Decided July 15, 1977.*

2

The causes were argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ORTH, JJ.

In appeal No. 6, *J. Lloyd Niles*, with whom were *Paul T. Sisson* and *Joan I. Gordon* on the brief, for Washington Suburban Sanitary Commission, part of appellants. *Warren K. Rich, Assistant Attorney General*, with whom were *Edward F. Lawson, Assistant Attorney General, Francis B. Burch, Attorney General*, and *Paul Walter, Assistant Attorney General*, on the brief, for other appellant.

In appeal No. 6, *Howard J. Thomas*, with whom were *Bradshaw, Thomas & Yeatman; Charles R. Donnenfeld; John W. Currie; Douglas G. Green; Arent, Fox, Kintner, Plotkin & Kahn; Smith, Miro, Hirsch, Brody & Zweig* and *Hogan & Hartson* on the brief, for appellees.

In appeal No. 133, *Charles R. Donnenfeld*, with whom were *Douglas G. Green; Cameron M. Blake; Arent, Fox, Kintner, Plotkin & Kahn; Hogan & Hartson; Howard J. Thomas; Bradshaw, Thomas & Yeatman* and *Smith, Miro, Hirsch, Brody & Zweig* on the brief, for appellants.

In appeal No. 133, *Gus B. Bauman, Associate General Counsel*, for Maryland-National Capital Park and Planning Commission, part of appellees. *Richard E. Frederick, Assistant County Attorney*, with whom was *Richard S. McKernon, County Attorney* on the brief, for Montgomery County, Maryland, another appellee. *Roger W. Titus* for Citizens Coordinating Committee on Friendship Heights, Inc. et al., other appellees.

MURPHY, C. J., delivered the opinion of the Court.

We deal here in a single opinion with two separate but related appeals involving a developer's plan to construct a

large commercial mall in Montgomery County, Maryland. Primarily at issue in Appeal No. 6 is whether the Circuit Court for Montgomery County (Mathias, J.) was correct in holding that the Washington Suburban Sanitary Commission (the WSSC) improperly denied the developer a sewer hookup permit which it needed to proceed with the planned construction. Primarily at issue in Appeal No. 133 is whether Montgomery County is estopped to bar the developer's project, notwithstanding an intervening downzoning of the developer's property to a scale inhibiting implementation of the planned construction, because of an alleged wrongful withholding of the sewer hookup permit caused by illegal acts of the County and other governmental agencies perpetrated prior to enactment of the downzoning resolution. The Circuit Court for Montgomery County (Mathias, J.) held that the County was not estopped to bar the developer's project. We granted certiorari in both cases after appeals were entered, but before decision by the Court of Special Appeals. Maryland Code (1974), Courts and Judicial Proceedings Article, § 12-201.

While the parties draw different inferences and conclusions from the evidence presented in the cases, the basic facts are these: Woodward & Lothrop, Inc. owns a department store containing approximately 178,000 square feet of shopping floor area located on an eight-acre tract of land at the intersection of Wisconsin and Western Avenues in the Central Business District of Friendship Heights, Maryland. In mid-1971, it formulated plans with TKU Associates and the Taubman Company, Inc. (hereinafter collectively referred to as Woodies) to replace its store and extensively redevelop the eight-acre site by constructing thereon a commercial mall complex, to be known as Town Center. The complex was to consist of a new and enlarged Woodward & Lothrop department store, a Garfinckel's department store, various other stores, mall shops, and commercial offices, comprising in all 900,340 square feet of retail and commercial space, with parking facilities — an increase of 722,340 square feet over that contained in the existing store on the site. Woodies planned to construct the

Town Center in several phases over a five-year period, with its new department store, and other stores and shops to be built on the parking lot adjacent to the existing store, after which its old store would be demolished and other mall shops and commercial facilities erected in its place. The complex was to be connected by tunnel to the rotunda of a planned rapid transit (Metro) station to be built in Friendship Heights by the Washington Metropolitan Area Transit Authority (WMATA).

While the Town Center project was buildable as of right under the then existing C-2 (General commercial) zoning, construction could not begin unless and until Woodies (a) placed on record a plan of subdivision and final record plat approved by the Maryland-National Capital Park and Planning Commission (the Planning Commission),[1] (b) obtained a sewer hookup permit from the Washington Suburban Sanitary Commission,[2] and (c) obtained a building permit from Montgomery County.[3] Beginning in late 1971 and continuing through mid-1972, Woodies expended large sums of money for the preparation of building plans, traffic, market and other studies, and for fees of architects, surveyors, lawyers, and other expenses associated with the project. During this period, Woodies' representatives attended numerous meetings and conferences with officials of the various governmental agencies whose approval would be needed before the project could be implemented; at these meetings Woodies fully disclosed its building plans by displaying models, sketches, and architectural renderings.

On December 22, 1971, Woodies filed a preliminary plan of subdivision with the Planning Commission.[4] As a condition precedent to the Planning Commission's approval of the

---

1. *See* Maryland Code (1957, 1976 Cum. Supp.) Art. 66D, § 7-115 *et seq.*; Montgomery County Code (1972), ch. 50.

2. Montgomery County Code (1972), ch. 86, § 86-8-3.

3. Montgomery County Code (1972, 1975 Cum. Supp.), ch. 8, § 8-24; Maryland Code, Art. 66D, § 8-120.

4. The subdivision plan was required because the site of the proposed Town Center involved two tracts of land which had never been subdivided and the proposed redevelopment plan involved construction across a lot line.

plan, it was required to consider the availability of water and sewerage facilities to the proposed subdivision and make its determination "upon the recommendation" of the WSSC.[5] On January 26, 1972, after the WSSC had reviewed the preliminary subdivision plan, it noted thereon that the plan was "Suitable for water and sewer design, without commitments as to installation." The Montgomery County Planning Board of the Planning Commission approved the preliminary subdivision plan on February 24, 1972. Consistent with requirements imposed by the County's subdivision regulations,[6] the approval was contingent upon Woodies dedicating designated parcels of its land for public use for future streets, roads, and pedestrian walkways.

On March 29, 1972, the WSSC imposed a sewer moratorium in the Little Falls Drainage Basin tributary to the Blue Plains Treatment Plant, which included the proposed Town Center project; the moratorium order barred sewer service to replacement facilities that would generate sewage flows in excess of those of existing facilities. Prior to granting final approval of Woodies' proposed subdivision plan, the Planning Commission sought further assurances from the WSSC that sewer service would be available to Woodies' redevelopment project; the Planning Commission expressed concern that in view of the size of the proposed Town Center, the project could not be implemented without violating the WSSC's sewer moratorium order. On April 26, 1972, Woodies wrote to the WSSC, requesting that it advise the Planning Commission that sewer service would be available for the Town Center. Woodies supplied the WSSC at that time with detailed information concerning the number of plumbing drainage fixtures proposed for inclusion in the new project. It stated that by utilizing water saving devices, and by eliminating "high water users" such as restaurants and beauty salons from the project until after the sewer moratorium had been terminated, the amount of sewage flow generated by Town Center would be less than

5. County Code (1972), ch. 50, §§ 50-27 and 50-35.
6. County Code (1972), ch. 50, § 50-2 et seq.

that generated by the existing facility. On May 3, 1972, the WSSC advised the Planning Commission by letter that sewers abutted Woodies' property and that service could be provided. WSSC based its confirmation "on information" which Woodies had furnished to it that "no additional sewage flows will be generated by the proposed buildings since the existing building is to be removed." By another letter dated May 24, 1972, the WSSC advised the Planning Commission that while no construction plans for the proposed development had been submitted to it for review and approval, the information furnished by Woodies "based upon standard methods of determining design sewage flows from plumbing fixtures, indicates that from a sewer design standpoint no greater flows would be expected from the proposed plumbing fixtures than from the fixtures contained in the existing store." WSSC advised the Planning Commission that the statement contained in its letter of May 3 that sewerage service could be provided to the project was based solely upon its understanding with Woodies "that the proposed development will not generate additional sewage . . . [and that] it will be incumbent upon the developer to insure that the design of the buildings . . . will . . . ensure that no additional sewage flows will be generated." In its May 24th letter, the WSSC stated that "this element of the design will be monitored by the Commission's Plumbing Division at such time as final construction plans are submitted for review and approval in accordance with an application for plumbing permits."

Deeming itself bound by the recommendation of the WSSC with respect to the availability of sewer service, the Planning Commission approved Woodies' final record plat. The required land dedications having been made by Woodies as part of the subdivision process, the property was recorded as one lot in the county land records on June 22, 1972. As of that time, Woodies had expended approximately $1,500,000 on the project. In addition, the land which it had dedicated for public use, amounting to approximately 41,000 square feet, was valued in excess of $800,000.

Woodies applied to the County for a building permit for

Town Center in September of 1972. It could not, however, obtain the permit until it first obtained a sewer hookup permit from the WSSC. It applied for that permit on October 25, 1972. It anticipated early approval of its application and was prepared to begin construction within 90 days after receiving a building permit from the County.

As these events were transpiring, the future commercial development of the Friendship Heights Central Business District (CBD) and surrounding area was under intensive study. On June 22, 1971 — at approximately the same time as Woodies was initially formulating its Town Center project — the Montgomery County Council had enacted a resolution creating a Citizens Advisory Committee to study zoning in central business districts throughout the county. Shortly thereafter, the Planning Commission appointed an Advisory Committee to assist it in preparing a detailed development plan for the Friendship Heights CBD, such a plan having been recommended by the 1970 Master Plan for the Bethesda-Chevy Chase planning area (the B-CC Master Plan), of which Friendship Heights was a part; that plan recognized that then existing commercial zones were unsatisfactory for the adequate development of CBD zones and recommended adoption of new commercial zones.

As a result of the activities of these committees, and of Planning Commission studies conducted during 1972, a "Preliminary Sector Plan for the Central Business District of Friendship Heights" was completed in December of 1972. It recommended a reduction in the boundaries of the CBD, the adoption of three new and more restrictive zoning classifications to replace all others within the CBD, and a substantial reduction in the amount and intensity of development within the CBD. It recommended that Woodies' property be rezoned from C-2 to CBD-2, a classification which would have permitted the Town Center to be constructed in accordance with Woodies' then existing building plans.

Aware that curtailment of future commercial development within the Friendship Heights area was under active study by the Planning Commission, Woodies pressed

the WSSC throughout late 1972 for approval of its sewer permit application. By this time, however, considerable concern had been and was being expressed by citizens and individual members of the Planning Commission and County Council that the Town Center, being so much larger than the existing Woodward & Lothrop store, would if constructed generate greater sewage flows than were permissible under the sewer moratorium order. Council and Planning Commission members were publicly critical of the WSSC's performance, expressing the view that the WSSC was not acting upon reliable or accurate information in calculating sewage flows in connection with its subdivision plan recommendations and its approval of sewer hookup permits. Members of the staff of the WSSC who were responsible for passing upon the issuance of sewer hookup permits viewed this criticism as an effort to dissuade the WSSC from issuing a permit for the Town Center project.

A meeting was arranged on February 13, 1973 between the Planning Commission and the WSSC to discuss a wide range of topics of mutual concern, including the need for better communications and closer liaison between the two agencies. The agenda included discussion of the availability of sewer service to accommodate new developments, and specifically encompassed the proposed Town Center project. At the meeting, sewage flow monitoring by WSSC was discussed. Planning Commission officials expressed concern over the scale of Woodies' proposed development and the need for a careful determination of the merits of its sewer permit application. It was discovered at the meeting that the WSSC had never read the sewage meter at the Woodward & Lothrop store and therefore had no exact information with respect to the outflow of sewage from the existing facility. As a result of this meeting, the agencies devised a format to assure that more reliable information would be assembled at the subdivision processing stage relative to sewer availability.

Concern had also been expressed that the Town Center project constituted too intensive a redevelopment project within the Friendship Heights CBD and should not be

permitted. At a public hearing held on February 7, 1973 before the Montgomery County Planning Board on the Preliminary Sector Plan for the Friendship Heights CBD, it had been suggested by a representative of the Citizens Coordinating Committee of Friendship Heights that if the entire area were promptly downzoned to limit future commercial development, and if the WSSC failed to act on Woodies' sewer permit application, Woodies could not obtain the requisite building permit needed to begin construction and could not obtain "vested rights" prior to the time that its property was downzoned.

On February 15, 1973, WSSC officials met with representatives of Woodies to discuss the sewer permit application, Woodies having been unsuccessful in its repeated efforts to arrange an earlier meeting. WSSC officials expressed a need for additional sewage flow information before they could act on the application. On March 1, 1973, Woodies submitted a study of the metered sewage flow from a comparable project in Milwaukee which demonstrated that the Town Center, as it was designed to operate in view of constraints imposed by the moratorium order, would not increase the sewage flow from the site. Not satisfied, WSSC requested that further studies be made of existing shopping centers in the Metropolitan Washington area. Woodies submitted studies of three such shopping centers on March 27, 1973, which indicated that, with the use of water saving devices, the sewage flow from Town Center would not be greater than that generated by its existing facility. Once again, the WSSC asked for additional information that would take into account factors not previously considered. Woodies complied, submitting its final study on June 21, 1973; this study superseded all previous studies and again showed that no greater sewage flows would be involved.

During the period from February to June of 1973, WSSC officials received numerous communications from citizens and individual members of the Council and Planning Commission expressing a desire that the WSSC not issue a sewer permit for the project. In June of 1973, a new Director

of Project Planning for the WSSC was appointed and given responsibility to evaluate the merits of Woodies' application. He developed reservations with respect to the validity of the sewage flow information supplied by Woodies; he also voiced concern that a 16-inch water main was needed to service the project, the installation of which would require an amendment to the Council's 10-year water and sewerage capital improvement plan and, presumably, further delay implementation of the proposed complex.

The Planning Board by this time was preparing a Final Draft Sector Plan for the Friendship Heights CBD. It had studied the record amassed at the public hearings held in February and March of 1973 on the Preliminary Sector Plan, at which considerable criticism had been directed at the proposed intensity of the Town Center project in view of existing traffic and environmental constraints upon development within the CBD. The Planning Board decided in June of 1973 to recommend that Woodies' property not be zoned CBD-2, as originally recommended in the Preliminary Sector Plan, but rather CBD-1 — a less intensive zoning classification which, if enacted, would so reduce the permissible scale of development of Woodies' property that the Town Center could not be built. It was explained that the project, as originally proposed by Woodies, had been included in the Preliminary Sector Plan with a CBD-2 zoning classification only because of the prior approval of Woodies' subdivision plat and the belief that the WSSC would approve its sewer permit application.

Because of the delay in acting on its application, Woodies demanded a hearing before the WSSC. It was, however, unsuccessful in having one firmly scheduled until August 29, 1973. That hearing was cancelled by WSSC on August 22, 1973; a letter signed by its Secretary on that date advised Woodies that a new sewer moratorium order had been issued on August 16, 1973 by the Secretary of the State Department of Health and Mental Hygiene. As a consequence, the letter stated that the scheduled hearing would "serve no useful purpose" and that "it has been

determined that the requested service cannot be provided at this time."

Woodies viewed the Secretary's letter as the equivalent of a denial of its sewer permit application. On October 15, 1973, it ˌsued the WSSC in ˌthe Circuit Court for Montgomery County, in equity, there being no statutory right to appeal from the action taken by the agency. Woodies alleged that it was entitled to a sewer permit prior to the passage of the Secretary's sewer moratorium order of August 16, 1973 but that, in any event, the order did not preclude granting a permit since no greater sewage flows would be generated by the Town Center project than were presently permissible. Woodies sought a decree compelling WSSC to issue the sewer permit, or in the alternative, to hold a hearing on its application and render a decision.

The sewer permit case was not scheduled for trial until the summer of 1974. In the interim, the Final Draft Sector Plan for the Friendship Heights CBD was adopted with modifications by the Council on May 28, 1974. The more restrictive CBD zoning classifications having earlier been enacted by the Council,[7] the Adopted Sector Plan was implemented by Council Resolution 7-1849 enacted on July 16, 1974, granting a sectional map amendment[8] comprehensively rezoning the CBD in its entirety, including Woodies' property which was downzoned to a CBD-1 classification, thus inhibiting construction of the Town Center. Woodies entered an appeal from the Council's resolution.

The trial of the sewer permit case, in which the State Department of Health and Mental Hygiene intervened as a party defendant, was concluded on September 23, 1974. Judge Mathias held that the WSSC's refusal to act on Woodies' application was tantamount to a final decision denying the application. He found as a fact from the evidence that the WSSC had never prepared a report on

7. County Code (1972, 1975 Cum. Supp.), ch. 59, §§ 59-51.3, .4, and .5; §§ 59-31.2 and .3 (optional method of development).

8. *See* County Code (1972), ch. 59, § 59-195.

Woodies' application prior to denying it; that the Secretary's moratorium order did not bar the WSSC from issuing permits for sewer hookups where there would be no increase of hydraulic or organic flow; that the WSSC misconstrued the Secretary's order "to deny the plaintiffs a hearing and to withhold approval of their application"; and that "the conduct of WSSC throughout its dealings with . . . [Woodies was] devious and lacking in good faith." Judge Mathias found as a fact from the conflicting expert evidence before him that the proposed complex would not generate a higher flow than was generated by Woodies' existing facility. He concluded:

"In reaching our decision in this case, we note WSSC is charged by law with the duty of acting upon applications for approval of sewer and water hookups. In performing this duty, however, WSSC is not required to hold hearings, although customarily it does; nor is it required to make findings. Its decisions, however, like those of any administrative agency, must be supported by some evidence. To reach a decision without some evidence in support thereof is to act arbitrarily and capriciously.

"Plaintiffs have adduced convincing evidence to show a dereliction of duty on the part of WSSC's staff. It had the plain duty to evaluate plaintiffs' application, and if necessary to assemble relative data of its own for presentation to the Commission so that the Commission might make an informed judgment. The staff did neither. The statement in WSSC's letter of August 10, 1973, 'that 'The Engineering Department has completed its study and report thereon is being readied for Commission consideration' was shown by the evidence to be untrue. The statement in WSSC's letter of August 22, 1973, attributing cancellation of the scheduled hearing to the Department of Health & Mental Hygiene's moratorium of August 16, was also untrue."

In view of the Council's earlier resolution which downzoned Woodies' property, Judge Mathias specified in his decree dated December 18, 1974 that the Town Center project could not be undertaken unless Woodies' former zoning classification was restored or "equivalent events" occurred, namely:

> "(1) the property being made subject to any other zoning classification lawfully permitting construction thereof; or (2) establishment (in a separate judicial proceeding or by administrative action) that said construction may proceed, notwithstanding any supervening zoning change, whether by reason of dedications of property and/or other reliance on the pre-existing zoning classification; by reason of improper governmental delays in granting plumbing and sewer authorizations which prevented issuance of a building permit for such construction; or for any other reason."

Woodies thereafter filed a declaratory judgment action naming Montgomery County, the County Council, and the Planning Commission as defendants; it sought a declaration that its development rights under the previously existing C-2 zoning were not affected by the Council's downzoning resolution of July 16, 1974. It alleged, in substance, that the defendants had led it to believe that it would be permitted to build the Town Center project; that in reliance thereon Woodies made cash payments and incurred liabilities in excess of $1,500,000, yielded title to land valued at $800,000, and paid $45,000 to WMATA in connection with work on the Metro station; but that the defendants conspired to prevent the development plan by causing the WSSC to delay action on its sewer permit application, without regard to its merits, in order to impede issuance of a building permit until such time as its property could be downzoned. The action recited that the defendants' unlawful actions were "for the sole purpose of placating, for political and other invalid motives, a highly vocal and politically-powerful group of county

residents" and that in furtherance of the scheme, the defendants did subject the property to arbitrary zoning changes. Woodies asserted that by reason of land dedications, expenditures, and undertakings which had been made in connection with its subdivision plan, and the course of dealings between the parties, it had obtained vested rights in the pre-existing C-2 zoning, so as to be protected from the adverse effects of the Council's downzoning action; it sought a declaration that, as to it, the downzoning resolution was null and void.

While this case was awaiting trial, the statutory zoning appeal was decided on July 15, 1976 by the Circuit Court for Montgomery County (Miller, J.). It reversed the Council's resolution granting the sectional map amendment, thus restoring the C-2 zoning classification of Woodies' property and qualifying it for issuance of the sewer permit under the terms of Judge Mathias' December 18, 1974 decree. Appeals were entered from this order and since the Council had earlier enacted a new text-change ordinance severely restricting the development scale previously permitted in the C-2 zone, Woodies was prohibited from constructing the Town Center, pending a determination of its declaratory judgment action.

On October 22, 1976, the circuit court (Mathias, J.), at the conclusion of evidence presented by Woodies in support of its declaratory judgment suit, granted motions to dismiss the action under Maryland Rule 535. It entered a decree that Woodies was not "on the basis of the evidence adduced in this proceeding, entitled to a Declaration that Resolution 7-1849, adopted July 16, 1974 ... which accomplished the down-zoning complained of ... is null and void." In an opinion accompanying its decree, Judge Mathias concluded that Woodies had not adduced any evidence to support its contentions. After a detailed appraisal of the evidence, he concluded:

> "The first contention, which is that plaintiffs were led to believe they would be permitted to proceed with their project after having dedicated land, etc., appears to rest on an estoppel theory. We

note, at the outset, that nowhere in the evidence is there any indication that any public official offered plaintiffs the assurance that their project would be approved if they made the required dedications and contributions. These are requirements of the subdivision regulations, and were not discriminatingly applied against plaintiffs. . . .

". . . [P]laintiffs' second contention is that the defendants caused the WSSC wrongfully to delay action on plaintiffs' application for a sewer permit, regardless of its merits, until plaintiffs' property could be down-zoned.

"It seems to us that in order for plaintiffs to prevail on this contention, they must (1) prove that the WSSC *wrongfully* delayed action on the plaintiffs' application without regard to its merits, and (2) that the defendants were the cause of the WSSC's wrongful actions; or, in other words, were joint wrong-doers.

"It would appear from the evidence in this case, plaintiffs have failed on both scores. While we are aware that these same plaintiffs, in Equity #47533, tried earlier, proved the WSSC guilty of wrongfully delaying action on plaintiffs' application for this very same sewer permit, the defendants here were not parties to that suit and, hence, are not bound thereby. We find no legally sufficient evidence in this action of any wrongful delay by the WSSC. Defendants patently cannot be found guilty of causing WSSC's wrongful action where none has been shown. . . .

". . . The evidence indicates leading members of both the County Council and [Planning Commission] were opposed to the plaintiffs' project in the belief it would engender additional sewage flow. We find no probative evidence that members of these agencies did anything more than attempt to persuade the WSSC that their view was correct. Both bodies had a legitimate concern with the

outcome of the plaintiffs' application; and the individual members of these agencies, in expressing their views, did not, in our opinion, abuse their authority as alleged. Furthermore, although the public bodies themselves are the defendants, we find no evidence whatsoever of any official action on their part relating to plaintiffs' application for a sewer permit. . . .

"We must disagree with plaintiffs that a reasonable inference of wrongdoing on the part of the [Planning Commission] can be drawn from random excerpts, admittedly not verbatim, of the February 13, 1973 meeting. Such purported statements, for example, as *'if there is a basis for it*, the hookup should not be allowed', or *'if there is reasonable doubt* that the development would produce flows in excess of capacity, you would not issue a permit', or even 'if you fail to grant a sewer permit, they cannot get their building permit and that stops things right there' do not justify an inference that the [Planning Commission] was engaging in wrongful action to have the WSSC delay action on plaintiffs' application for a sewer permit *without regard to its merits*. Even this evidence, as weak as it is, was further watered down when plaintiffs' witnesses, on cross-examination, flatly disaffirmed any effort to get the WSSC to delay plaintiffs' application in disregard of its merits. The documentary evidence purporting to link the defendant County to any wrongdoing with respect to the plaintiffs' application to WSSC for a sewer permit is even less convincing. We believe it simply does not justify any inference of improper conduct." (Emphasis in original.)

In *Montgomery County, Maryland v. Woodward & Lothrop, Inc.*, 280 Md. 686, 376 A. 2d 483 (1977), we vacated the order of the Circuit Court for Montgomery County which

reversed Council Resolution 7-1849; we held that the sectional map amendment comprehensively rezoning all properties within the Friendship Heights CBD, including Woodies' property, was lawful in all respects.

It is against this painful and terribly tedious background that we now address the issues raised in the two appeals now before us.

### Appeal No. 133

### (The Declaratory Judgment Action)

Woodies contends that the lower court erroneously failed to apply collateral estoppel to bar relitigation of the wrongful WSSC action previously adjudicated in the sewer permit case. The issue arose in this manner: the defendants sought to cross-examine Woodies' witness Stephen Profilet, WSSC's Director of Project Planning, who had testified at the earlier sewer permit case, concerning decisions made by WSSC in the summer of 1973 with respect to Woodies' sewer permit application. Woodies objected on the ground that such cross-examination was barred by the doctrine of collateral estoppel. Judge Mathias, relying on *Pat Perusse Realty v. Lingo*, 249 Md. 33, 238 A. 2d 100 (1968), ruled that collateral estoppel principles were inapplicable to bar the defendants from litigating the issue of whether the WSSC wrongfully delayed action on Woodies' application; he said that the defendants, not being parties but rather "strangers" to the earlier suit, and not in privity with the WSSC, were not bound by the judgment in that case. As a result, the lower court refused to admit into evidence the record of the sewer permit case, or to permit Woodies to question the same WSSC witnesses who had testified in the earlier case by leading questions.

We think Judge Mathias was correct in his rulings. In *Pat Perusse*, Judge Hammond for the Court approved a four-part test which must be satisfied in order for the doctrine of collateral estoppel to be applicable, *i.e.* (249 Md. at 45):

1. Was the issue decided in the prior adjudication

identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

While the first two parts of the test were met, the third and fourth were not. The defendants — Montgomery County, the County Council, the Planning Commission and (by intervention) the Citizens Coordinating Committee of Friendship Heights — were not parties in the sewer permit case, nor were any of them in privity with the WSSC or the intervenor State Department of Health and Mental Hygiene. Consequently, there being no identity of parties in the two cases, the defendants are not bound by any determinations of fact or issues actually litigated in the earlier case. *See MPC, Inc. v. Kenny*, 279 Md. 29, 367 A. 2d 486 (1977).

This is not, as Woodies seemingly alleges, a case of successive suits involving officers or agencies of the same government where authority to act on behalf of that government's interest in finally adjudicating a particular issue is vested in its representative in the earlier litigation.[9] This case involves separate governments and unrelated governmental entities. Neither is this a case involving adverse litigation against a subordinate governmental official or agency which is subject to control by, and authorized to represent, a higher governmental official or agency for the specific matter in question.[10] None of the governmental agencies in this case is superior or subordinate to the same government, but each is a separate

---

**9.** *See, e.g.*, Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381, 60 S. Ct. 907, 84 L. Ed. 1263 (1940); Tait v. Western Maryland Ry. Co., 62 F. 2d 933 (4th Cir. 1933), *aff'd*, 289 U. S. 620, 53 S. Ct. 706, 77 L. Ed. 1405 (1933).

**10.** *See, e.g.*, Lerner v. Los Angeles City Board of Education, 59 Cal. 2d 382, 380 P. 2d 97, 29 Cal. Rptr. 657 (1963); City of Elmhurst v. Kegerreis, 392 Ill. 195, 64 N.E.2d 450 (1945); Deason v. DeKalb County, 222 Ga. 63, 148 S.E.2d 414 (1966); French v. Rishell, 40 Cal. 2d 477, 254 P. 2d 26 (1953).

and independent unit. Nor is this a case which implicates, as against the Citizens Coordinating Committee, the theory of "virtual representation," *i.e.*, that a government and its citizens may also be in privity so that a suit between the government and a private party may bar relitigation of the same issues in a suit between a citizen and the private party. *See Healy v. Deering*, 231 Ill. 423, 83 N. E. 226 (1907); *Allied Van Lines v. Central Forwarding, Inc.*, 535 S.W.2d 412 (Tex. Civ. App. 1976); and *compare Holt v. Moxley*, 157 Md. 619, 147 A. 596 (1929).

Montgomery County, the County Council, and the Planning Commission are governmental bodies separate and distinct from the WSSC and the State Department of Health and Mental Hygiene. None is the alter ego of any other. Each has its own sphere of governmental authority and none of the defendants controls or is authorized to act for and bind either the WSSC or the Department. They do not share a common superior; each appoints its own counsel; they have different statutory areas of responsibility, which they exercise independently of each other. As to the powers and responsibilities of the WSSC, see County Code (1972), ch. 86; *Board of Appeals v. Marina Apts.*, 272 Md. 691, 326 A. 2d 734 (1974); *Bowie v. Wash. Sub. San. Comm'n*, 249 Md. 611, 241 A. 2d 396 (1968). *See also State v. Canova*, 278 Md. 483, 365 A. 2d 988 (1976). As to the State Department of Health and Mental Hygiene, see Maryland Code (1957, 1971 Repl. Vol.), Art. 43. As to Montgomery County (a charter county) and the County Council, see Maryland Constitution, Art. XI-A, and Maryland Code (1957, 1973 Repl. Vol.), Art. 25A. As to the Planning Commission, see Maryland Code, Art. 66D; *O & B, Inc. v. Md.-Nat'l Cap. P. & P.*, 279 Md. 459, 369 A. 2d 553 (1977); *Pr. George's Co. v. Md.-Nat'l Cap.*, 269 Md. 202, 306 A. 2d 223, *cert. denied*, 414 U. S. 1068, 94 S. Ct. 577, 38 L.Ed.2d 473 (1973).

Woodies next contends that the lower court applied the wrong evidentiary standard and erroneously concluded that a prima facie case of either wrongful action by WSSC or wrongful participation by the defendants in such wrongful action had not been established.

We said in *Hooton v. Kenneth B. Mumaw P. & H. Co.*, 271 Md. 565, 318 A. 2d 514 (1974), that in cases where a motion to dismiss under Maryland Rule 535 has properly been filed, the trial judge is required, in testing the legal sufficiency of the evidence produced by the plaintiff, to consider the evidence and all logical and reasonable inferences deducible therefrom in the light most favorable to the plaintiff. Contrary to Woodies' argument, we think that Judge Mathias applied this evidentiary standard in granting the motions to dismiss.

We have carefully examined the evidence adduced at the trial of the declaratory judgment action and, even assuming that a prima facie case of wrongful WSSC delay was made out, there is no evidence or reasonable inferences therefrom to show that the Planning Commission and the County Council conspired to cause the WSSC to withhold issuance of the permit without regard to its merits. We think it plain from the record that the WSSC was subject to valid criticism for its handling of Woodies' application for sewer service, not alone from Woodies, but also from the Council and the Planning Commission, each of whom had legitimate reason to be concerned with the construction of a project having such a vital impact on planning and zoning decisions, and such a potential for causing sewage overflows and health problems in the county. That they voiced their concern in these circumstances and urged the WSSC to deny the permit if upon careful study the merits dictated that course of action is not the equivalent of wrongful governmental pressure brought to bear upon a sister agency.

There was, as Judge Mathias found, no probative evidence that individual members of the Council and Planning Commission did anything more than attempt to persuade the WSSC that the permit not be issued if it violated the sewer moratorium. In so concluding, we have focused upon those particular evidentiary aspects of the case believed by Woodies to justify the drawing of a reasonable inference that the Planning Commission and County Council caused the WSSC to act wrongfully. The unofficial notes taken by a secretary at the open meeting between the Planning

Commission and WSSC on February 13, 1973 do not, as the lower court found, demonstrate the existence of a conspiracy to cause WSSC to deny Woodies' application; at best, they reflect a request that the WSSC carefully consider Woodies' application on its merits. The evidence that the WSSC disclosed an intention to the Montgomery County Planning Board in July of 1973 to deny Woodies' permit does not justify a reasonable inference that that decision was influenced or caused by the Council or the Planning Commission. Nor does the mere fact that the future commercial development of the Friendship Heights CBD was under study at the same time as Woodies was seeking to redevelop its property justify an inference of wrongful manipulation of the WSSC by either the Council or the Planning Commission.

Woodies next contends that it obtained vested rights in its prior C-2 zoning classification by reason of having, at the inducement of the County and the Planning Commission, dedicated valuable rights-of-way in connection with its subdivision plan, and entered upon costly commitments for the County's benefit in contemplation that Town Center would be permitted to go forward. It claims that the County is estopped from relying upon its own downzoning action to inhibit the project; in support it cites *City of Baltimore v. Crane*, 277 Md. 198, 352 A. 2d 786 (1976). That case involved a conveyance of land by a property owner to the City for highway purposes in reliance upon an ordinance which provided that after such conveyance the property owner could develop his remaining property at a particular density. We there held that the ordinance constituted an offer which the property owner accepted when he conveyed his property, thus creating a vested contractual interest which could not be affected by any subsequent zoning change. No such statutory provision is involved here and no contractual interest was created. Nothing in the County's subdivision regulations guaranteed Woodies that its project would be approved, and unlike *Crane*, they do not constitute an offer. As Judge Mathias held, there was no evidence that any public official offered Woodies any assurance that its project

would be approved if it made the requisite dedications, or that its C-2 zoning classification would be retained, or that a sewer or building permit would be issued. There was no evidence that the Planning Commission or the County knew that the sewer permit would not be granted when the dedications were made and the sums expended on the planned project. Since no vested rights are here involved, there can be no estoppel. *Rockville Fuel v. Gaithersburg*, 266 Md. 117, 291 A. 2d 672 (1972). Of course, in order to obtain a vested zoning status, there must be construction on the ground; merely to allege large expenditures without actual construction on the site cannot vest zoning rights. *County Council v. District Land*, 274 Md. 691, 337 A. 2d 712 (1975); *Rockville Fuel v. Gaithersburg, supra.*

Woodies' reliance on dictum in *Richmond Corp. v. Bd. of Co. Comm'rs*, 254 Md. 244, 255 A. 2d 398 (1969), is equally misplaced. We there suggested at p. 256 that "administrative action, which unduly delays a property owner in making application for, or in obtaining a permit, in order to allow the passage of an amendment to the existing zoning ordinance making unlawful a previously contemplated lawful use, may estop the municipality from prohibiting the contemplated use pursuant to such an amendment." On the evidence in this case, *Richmond* is manifestly inapplicable.

In view of our disposition of these issues, we need not reach other issues raised by the defendants on their cross-petition for certiorari.

### Appeal No. 6

### (The Sewer Permit Case)

The WSSC and State Department of Health and Mental Hygiene challenge the lower court's decree on a number of grounds. Each contends that the WSSC did not officially act on or deny the permit, and that the lower court was in error in concluding that it did. The WSSC contends that Woodies failed to exhaust its administrative remedies prior to seeking judicial review; it suggests that the Board of Review of the State Department of Health and Mental Hygiene,

Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.) Art. 41, §§ 206A and B had jurisdiction to hear the case prior to an appeal being taken to the circuit court. The Department does not join in this contention; it does, however, raise other issues respecting whether the circuit court exceeded its powers of judicial review and unlawfully assumed the functions of the administrative agency itself. The WSSC argues that the lower court was clearly in error in holding, on the evidence adduced at the trial, that no greater sewage flows would result from construction of the Town Center than were generated by the existing store; and that the Department's sewer moratorium order of August 16, 1973 did not inhibit construction of the project. The Department does not join in this contention. It maintains, however, that the lower court's decree was defective in that it failed to incorporate language recognizing the Department's paramount authority to control discharges to the waters of the state in order to protect the public health. Finally, the Department takes issue with that part of the court's decree which would permit a sewage flow of 15,053 gallons per day for 365 days per year rather than 26 days per month, or for 312 days per year — an error of 797,809 gallons per year, which Woodies concededly now recognizes.

As interesting as these issues may be, we need not reach them in the present posture of the case. Quite simply, the basic issue in the case is whether the Town Center project, as proposed by Woodies' building plans, would generate a sewage flow in excess of the facility it was designed to replace, and whether the sewer moratorium order barred service to the site. On conflicting expert and other evidence, Judge Mathias found that no greater flows would be involved and that Woodies was entitled to the sewer permit. While our review of the evidence indicates that Judge Mathias was not clearly in error in so holding, it is manifest that his decree of December 18, 1974 cannot be implemented by issuance of a sewer permit consistent with the conditions therein outlined. The Town Center cannot now be constructed under the comprehensive zoning plan for Friendship Heights which was before us in *Montgomery*

*County, Maryland v. Woodward & Lothrop, Inc., supra.*
Since Woodies has no vested rights in its earlier C-2 zoning,
and since the County did not cause any wrongful delay in the
issuance of the sewer permit, the County is not estopped
from enforcing its downzoning resolution. Accordingly,
whether Woodies is entitled to a sewer permit for the Town
Center is now a moot issue. As Judge Digges said for the
Court in *Md. Tobacco Grow. v. Md. Tob. Auth.*, 267 Md. 20,
25-26, 296 A. 2d 578 (1972), "when the chronology of a case
makes it apparent that nothing we could do could undo or
remedy that which has already occurred, except under the
most extraordinary circumstances . . ., the case must be
dismissed as moot." We do not give opinions on abstract
propositions or moot questions and appeals which present
nothing else for decision are dismissed as a matter of course.
*State v. Ficker*, 266 Md. 500, 295 A. 2d 231 (1972); *Potts v.
Governor*, 255 Md. 445, 258 A. 2d 180 (1969); *Lloyd v.
Supervisors of Elections*, 206 Md. 36, 111 A. 2d 379 (1954). In
the circumstances of this case, it would be "an act of
futility, a useless gesture of no effect whatsoever, to
consider this appeal." *Md. Tobacco Grow. v. Md. Tob. Auth.*,
*supra* (267 Md. at 26).

> *As to No. 6: Decree of the Circuit
> Court for Montgomery County
> dated December 18, 1974
> vacated; appeal dismissed;
> costs to be paid by appellants.*
> *As to No. 133: Order affirmed;
> costs to be paid by appellants.*