630 A.2d 245

**LEEDS FEDERAL SAVINGS AND LOAN ASSOCIATION**

**v.**

**Dolores J. METCALF et vir.**

**No. 12, Sept. Term, 1993.**

Court of Appeals of Maryland.

Aug. 30, 1993.

Reconsideration Denied Oct. 1, 1993.

108

M. Albert Figinski (Edward F. Patz, David W. Erb, Weinberg and Green, on brief), Baltimore, for petitioner.

Thomas D. Herndon, Catonsville, and Bruce A. Kent, Arbutus, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, MCAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

Leeds Federal Savings and Loan Association (Leeds) timely appealed to the Court of Special Appeals from a judgment entered by the Circuit Court for Baltimore County upon a jury verdict in favor of Delores J. Metcalf and Merrill W. Metcalf, her husband, in the amount of $73,617. We issued a writ of certiorari prior to consideration of the case by the intermediate appellate court. 329 Md. 757, 621 A.2d 897. The ultimate issue to be resolved is whether there was legally sufficient evidence presented to the jury that Leeds breached its contracts with the Metcalfs when it permitted five passbook savings accounts of which the Metcalfs were joint tenants with Anna M. Lanahan to be closed without their consent. The resolution of that issue in turn depends in part upon what preclusive effect should be accorded a judgment entered in earlier litigation brought by the Metcalfs against Donna M. Buppert and Craig E. Buppert, her husband.

## I.

Viewing the evidence and the permissible inferences therefrom in the light most favorable to the Metcalfs, Maryland Rule 2–519, the following facts were established at trial.

Anna M. Lanahan, who died on March 15, 1988, at the age of 84 years, was the aunt of Delores J. Metcalf and the grandaunt of Donna M. Buppert. Mrs. Lanahan had resided with the Metcalfs from August 1978 to December 1987 at their former residence on Ashbourne Road in Baltimore City. Mrs. Lanahan resided with the Metcalfs on a full-time basis at their Baltimore home from August 1978 until December 1980 when they took up part-time residence in Stevensville on Kent Island in Queen Anne's County. Until finally taking up permanent residence in Stevensville in 1987, the Metcalfs maintained a room at the Ashbourne Road address for Mrs. Lanahan and provided care for her, including housecleaning, shopping, and transportation for her medical visits. They also maintained a room for her at their Stevensville home.

On October 23, 1983, Mrs. Lanahan and the Metcalfs went to the Arbutus branch of Leeds in Baltimore County where they established three passbook savings accounts held as joint tenants with right of survivorship. These were accounts numbered 43470, 1904495 and 1904496. On January 6, 1984, they opened account no. 1904523 under the same terms. On July 18, 1984, the three established account no. 0900143. Mrs. Lanahan was the source of all the funds on deposit in the five accounts.[1] Furthermore, Mrs. Lanahan used her social security number for the required tax identification purposes to open the accounts. The accounts were opened by execution of signature cards by Mrs. Lanahan and the Metcalfs. Above the signature lines, the signature card provides:

"The undersigned hereby apply for a savings deposit account in the **LEEDS FEDERAL SAVINGS AND LOAN ASSOCIATION, BALTIMORE, MD.** In accordance with provisions and in the form provided for on the face and reverse sides hereof, subject to its Charter and By-laws, and amendments thereto, to the rules, regulations and laws governing said Association, and subject also to the following:

---

1. The record reflects that although Delores Metcalf deposited some funds in the Leeds' accounts, the funds she deposited were withdrawn by her prior to January, 1988.

Each of the undersigned hereby authorizes any one of the others to endorse any check or other instrument payable to the order of anyone or more of the others, and to present same for credit to this account."

On the reverse side, the signature card further provides: "By the signatures of the persons shown on the reverse side hereof, application is hereby made for a savings deposit account in the **LEEDS FEDERAL SAVINGS AND LOAN ASSOCIATION, BALTIMORE, MD.** in the names of the persons whose signatures are firstly, secondly, thirdly and fourthly shown on this card, as joint tenants, with the right of survivorship, subject to the order of any one of said joint tenants, or to the order of any one of the survivors after the death of any one or more of them. *By the placing of money or funds in such form in said Association, it is agreed by and between the parties to this account that, in any action or proceedings in which said Association and/or any such survivor(s) may be a party, it shall be conclusively presumed that it was the intention of said parties to create a joint tenancy and to vest title in said money or funds, including any subsequent additions or accruals thereon in such survivor(s).* Specimens of the signatures of said persons are shown on the reverse side hereof and the Association is hereby authorized to act without further inquiry in accordance with writings bearing any one of such signatures, and upon the death of any one or more of said persons, the Association is thereupon authorized to act without further inquiry in accordance with writings bearing the signature(s) of any one of the survivors of said persons; it being understood and agreed that any one of said persons who shall first act shall have power to act in all matters relating to the membership and such account in said Association held by said persons, including the pledging of such account in whole or in part as security for any loan made by said Association to any one or more of said persons who shall first act, whether or not the other persons named in the account be living. The withdrawal or repurchase or redemption value of any such account or other rights relat-

ing thereto may be paid or delivered in whole or in part to any one or more of said persons, who shall first act, or to any one or more of the survivors after the death of any one or more of them, and such payment or delivery, or a receipt or acquittance signed by any one or more of said persons or by any one or more of the survivors after the death of any one or more of them shall be a valid and sufficient release and discharge of said Association.

"*Signature of any one co-tenant (with right of survivorship) is binding on the others."

Moreover, each of the passbooks issued for the five accounts bore the admonition as part of its "Information for Members": "NO WITHDRAWALS PERMITTED WITHOUT THIS BOOK." From the time that the several accounts were opened, Mrs. Lanahan retained possession of all five passbooks.

On January 25, 1988, Mrs. Lanahan telephoned Ms. Dorothy Dowell, then a vice president of Leeds. Lanahan informed Dowell that she was now living with her grandniece, Donna Buppert, at Westminster in Carroll County and wanted to move her accounts closer to her new home. She further informed Dowell that she wanted Donna Buppert's name on the accounts instead of the Metcalfs. Mrs. Lanahan did not wish to appear at the bank in person. Dowell informed her that the request would have to be reduced to a writing bearing her signature.

The following day, Donna Buppert appeared at the Arbutus branch of Leeds Federal where she presented the passbooks for the five savings accounts. She also presented a writing dated January 26, 1988 and bearing the signature of Anna M. Lanahan which read:

1–26–88

To Leeds Federal S & L,

I give my permission to Donna M. Buppert to change

alternate   ownership   &   signature   from:   Delores
Metcalf/Merrill Metcalf
to:   Donna  M.  Buppert
    Signed,  1–26–88
    Anna  M.  Lanahan

Upon presentation of the passbooks and the writing, accounts numbered 1904495, 1904496, 1904523 and 0900143 were closed and the funds transferred to a new joint account, no. 46002, opened in the names of Anna M. Lanahan and/or Donna M. Buppert, using Mrs. Lanahan's social security number for tax identification purposes. The same day, $7,423.24 was transferred from account no. 43470 [2] to the newly opened account. The total amount of funds transferred into the new account was $60,565.46. On the same day, the balance of the new account was withdrawn by check no. 838812 made payable to "Anna M. Lanahan and/or Donna M. Buppert", thus closing the account. The check was subsequently endorsed by Mrs. Lanahan and Mrs. Buppert and deposited in a joint savings account in their names at the Westminster branch of the Taneytown Bank & Trust Company. Mrs. Lanahan's social security number was used as the tax identification number for that account.

## II.

In June 1988, the Metcalfs filed suit in the Circuit Court for Carroll County against Donna M. Buppert and her husband, Craig E. Buppert. The Metcalfs subsequently filed an amended complaint containing four counts. In count one the Metcalfs alleged that the transfer of $60,565.46 from the Leed's accounts in the joint names of the Metcalfs and Lanahan to the account in the Taneytown Bank & Trust Company

---

**2.** After the transfer of $7,423.24 from account no. 43470 to the new account, $50.00 remained in account no. 43470. That account was the designated depository for Mrs. Lanahan's social security checks and was left open for that purpose. On March 8, 1988, $588.05 was withdrawn from that account and the account was closed. The withdrawal slip for this transaction bears the signature of Mrs. Lanahan, but the record contains no other evidence of how the transaction took place.

opened in the joint names of Lanahan and Donna M. Buppert
was accomplished by Buppert without the authority of Lana-
han and constituted a misappropriation by Buppert of the
funds in the joint accounts of the Metcalfs and Lanahan.[3]   The
Metcalfs asked the court to order Buppert to account for those
funds and sought damages against her for the alleged misap-
propriation.   On May 17, 1991, the Bupperts filed a Motion for
Summary Judgment which they supported with affidavits and
depositions taken in connection with the case.   A hearing was
held on November 21, 1991 before Judge Francis M. Arnold.
On December 2, 1991, Judge Arnold issued a Memorandum
Decision and Order, granting summary judgment on all four
counts of the amended complaint.   In granting summary
judgment as to Count I, the court ruled:

"There is no dispute that all of the money in these bank
accounts was deposited by Mrs. Lanahan nor is there any
dispute that she purchased the bonds.   On January 26, 1988
Donna Buppert closed the Leeds Federal accounts and
placed the money in a Taneytown Bank and Trust Company
account titled to Mrs. Lanahan and herself jointly.   Mrs.
Lanahan endorsed the check for deposit.   Mrs. Buppert
asserts by affidavit that these actions were done at Mrs.
Lanahan's direction."

The court continued:

"The Defendants seek Summary Judgment as to Count
One asserting that Ms. Lanahan directed the banking trans-
actions and that she had every right to make these transac-
tions.   The Accounts at Leeds Federal were titled as joint
accounts.   Mrs. Lanahan alone was the source of these
funds.   Mrs. Lanahan never relinquished control over the

---

**3.**   In Count Two the Metcalfs alleged that Donna M. Buppert had
misappropriated certain savings bonds owned by Lanahan.   They
sought an accounting and damages for the alleged misappropriation.
By Count Three the Metcalfs sought to have the court impose a
constructive trust on the home of the Bupperts, alleging that the funds
misappropriated by Donna M. Buppert were used to improve that
improved real property.   In Count Four the Metcalfs sought punitive
damages from Donna M. Buppert.

accounts and therefore never made an *inter vivos* gift of this money to the Plaintiffs. Mrs. Lanahan, at all times prior to her death, had the authority to close the accounts. The court concluded:

"Based on the affidavits and the depositions, the Court finds that there is no genuine dispute that Mrs. Lanahan had the mental capacity to direct that the accounts be closed and that she authorized Mrs. Buppert to close the accounts. Further, there is no dispute that Mrs. Buppert's actions were in compliance with Mrs. Lanahan's wishes and were not in breach of a fiduciary duty."

On January 13, 1992, the court entered a final judgment on its December 2, 1991 order. No appeal was taken from that judgment.

■ While the Carroll County litigation was pending, on January 9, 1991, the Metcalfs filed a three count complaint in the instant case in Circuit Court for Baltimore County against Leeds. Prior to trial, the court granted Leeds' Motion for Summary Judgment as to Counts Two and Three, claiming damages for breach of fiduciary duty and for breach of "standard of care". Count One, claiming damages for breach of contract, survived to trial. On March 25, 1992, at the close of all the evidence at trial, Leeds moved for judgment pursuant to Md. Rule 2–519. Leeds argued that the issue of Buppert's authority to act on behalf of Lanahan in closing the joint savings account which Lanahan held with the Metcalfs on January 26, 1989, had been fully litigated in *Metcalf v. Buppert* in Carroll County. Consequently, Leeds contended that the judgment in that action barred the Metcalfs from relitigating that issue in the instant case under the doctrine of defensive nonmutual collateral estoppel.[4]

---

4. Nonmutual collateral estoppel can be invoked offensively or defensively. *Welsh v. Gerber Products, Inc.,* 315 Md. 510, 517 n. 6, 555 A.2d 486, 489–90 n. 6 (1989). It is used offensively when a plaintiff attempts to bar a defendant from relitigating an issue the defendant previously litigated unsuccessfully in another action against a different party. Defensive use of nonmutual collateral estoppel occurs when a defen-

We first embraced that exception to the usual rule applicable to collateral estoppel, requiring that before a party may be collaterally estopped to relitigate an issue decided in a previous case that party or its privy must have been a party to the earlier litigation, in *Pat Perusse Realty v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968). In that case a husband and wife who had decided to separate employed a real estate broker to sell their home. The broker procured a buyer, but when the wife refused to consummate the sale, the broker sued both the husband and wife for his commission. Because the wife had moved from this state, she could not be served with process. Nevertheless, the broker elected to proceed against the husband alone. The court ruled in favor of the husband, finding that the broker had not procured a ready, willing and able buyer and consequently that he had not earned a commission under the terms of his contract.

Later, the broker sued the wife for the same commission. She defended on the ground of collateral estoppel. The trial court agreed with the wife. We affirmed despite the fact that the wife was not a party to the earlier litigation between the broker and the husband. Chief Judge Hall Hammond, writing for the court relied heavily on the decision of District Judge Edward S. Northrop in *State of Maryland v. Capital Airlines, Inc.,* 267 F.Supp. 298 (D.Md.1967). There Judge Northrop concluded:

"It would seem to this court that as long as the party against whom the judgment was sought to be used had a full and fair opportunity to be heard on the issue there would be no constitutional impediment to the application of the doctrine of collateral estoppel where there was no mutuality. All that due process requires is that 'the thing to be litigated was actually litigated in a previous suit, final judgment entered, and the party against whom the doctrine

dant seeks to prevent a plaintiff from relitigating an issue which the plaintiff previously litigated unsuccessfully in another action against a different party. *Id.*

is to be invoked had full opportunity to litigate the matter
) and did actually litigate it.' "

*Id.* at 304.

In adopting Judge Northrop's position, Chief Judge Hammond wrote:

"We have concluded that Judge Northrop was clairvoyant in his prediction as to the view this Court would take on mutuality of estoppel in a proper case. Perusse, in its suit against Ted, had its full day in court and full opportunity to win on its claim that it procured a buyer ready, willing and able to buy at the seller's price. Its claim was decided against it. There can be no doubt that it sought to relitigate that precisely identical issue in the attachment against Elizabeth. Public policy against repetitive identical litigation, which underlies the rule of res judicata, applies here with logic and force to provide that Perusse's rights were satisfied by having had its day in court on an issue, and that it is not entitled to another day in court against a particular defendant on that issue.

"Perusse suggests that it could perhaps try a better case against Elizabeth than it did against Ted. This argument, and the argument that there were errors in the conduct and the result of the trial which led to the first judgment, have been held to be unavailing where res judicata is applicable."

*Id.* 249 Md. at 45–46, 238 A.2d at 107–08.

In *Washington Suburban Sanitary Commission v. TKU Associates*, 281 Md. 1, 376 A.2d 505 (1977), we restated the four-part test adopted in *Perusse* for the application of the doctrine of non-mutual collateral estoppel:

"1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?"

*Id.* at 18–19, 376 A.2d at 514.

Applying that test to the circumstances present in *TKU Associates,* we held in an action brought against Montgomery County, its County Council and its Planning Commission that a developer of a proposed shopping mall could not invoke the doctrine of nonmutual collateral estoppel to bar relitigation of an issue of whether the Washington Suburban Sanitary Commission (WSSC) wrongfully delayed action on developer's application for a sewer permit, that issue having been decided adversely to WSSC in a prior action brought by the developer against it. That was so because Montgomery County, its County Council and its Planning Commission were not parties in the previous litigation nor were any of them in privity with WSSC. Consequently, the third and fourth parts of the test were not met.

In *Welsh v. Gerber Products, Inc.,* 315 Md. 510, 555 A.2d 486 (1989), we were again presented with the question of whether non-mutual collateral estoppel should be applied under the following circumstances. Kathleen and Patrick Welsh and their minor son Michael were injured when the station wagon in which they were riding was struck by a vehicle operated by James Voigt, III. At the time of the accident Michael was thrown forward when the car seat manufactured by Gerber Products, Inc. failed to restrain him, and he suffered severe injuries. The Welshes brought suit against Voigt in the Circuit Court for Montgomery County. The parties subsequently settled the litigation when the Welshes agreed to accept payment equal to the policy limits of Voigt's automobile insurance coverage. The Welshes executed a joint tortfeasor release by which they retained all claims against other tortfeasors subject to the *pro rata* reduction provided in the Maryland Uniform Contribution Among Tort–Feasors Act, Maryland Code (1957, 1991 Repl.Vol.), Article 50, §§ 16–24. Voigt further insisted that a consent judgment be entered against him and that satisfaction of that judgment be evidenced by a docket entry which was done.

Thereafter, the Welshes sued Gerber Products, Inc. in the United States District Court for the District of Maryland, alleging that the car seat which Michael occupied at the time of the accident was defective and that defect was a proximate cause of the injuries be suffered. The district court entered summary judgment in favor of Gerber Products, Inc., ruling that the satisfied consent judgment precluded, as a matter of law, any attempt to recover damages on behalf of Michael for the injuries he received in the accident. The Welshes appealed to the United States Court of Appeals for the Fourth Circuit which certified the question of whether defensive use of nonmutual collateral estoppel was proper. We held that it was not. We rejected Gerber's argument that when the Welshes secured the entry of a judgment they placed on the record a judicial determination of the value of their claims and that satisfaction of that judgment precluded them from seeking further compensation from anyone. Judge McAuliffe, speaking for this Court, reasoned:

"We are concerned here with Gerber's attempt to use defensively the doctrine of nonmutual collateral estoppel. Gerber points to the judgment rendered in the earlier proceeding brought by the Welshes against Voigt, and argues that the Welshes should be bound by the issues litigated in that case. Gerber is correct as far as it goes, but it does not go far enough. The Welshes may be bound by the issues actually and necessarily litigated in that proceeding. The foundation of the rule of nonmutual collateral estoppel is that the party to be bound must have had a full and fair opportunity to litigate the issues in question. When an issue was not required to be litigated and was not in fact litigated, the judgment ordinarily will not preclude its subsequent litigation.

As a factual matter, a consent judgment may, or may not, involve a determination of the amount that represents the complete equivalent of the plaintiff's damages. Where, as apparently is the case here, the parties make no attempt to agree upon or litigate the fair value of the claim, but agree instead to accept the available insurance coverage while specifically reserving the right of the plaintiff to proceed

against others for full compensation, a consent judgment entered to give effect to the agreement does not in fact represent the result of litigation of the issue of damages. On the other hand, the parties to a proceeding are not precluded from reaching an agreement concerning the full measure of damages, where a judgment is entered in confirmation of that type of agreement, it will represent the judicial determination, albeit by consent, of that issue." *Id.* at 518–19, 555 A.2d at 490. See also *Jones v. Baltimore City Police*, 326 Md. 480, 487–88, 606 A.2d 214, 217–18 (1992) (judgment relied on for nonmutual collateral estoppel must be final judgment); Restatement (Second) of Judgements §§ 27–29 (1982).

In the instant case the issue sought to be relitigated by the Metcalfs was whether Buppert acted with complete authority from Lanahan in assisting Lanahan's closure of the joint passbook accounts she held at Leeds and transferring the funds in those accounts to a joint account with Buppert at the Taneytown Bank & Trust Company. That issue was essential to the decision of the Circuit Court for Carroll County, and it was resolved adversely to the Metcalfs. That issue also was central in the instant case since Leeds asserted in defense to the Metcalf's claim of breach of contract that it did no more than honor Lanahan's desire to unilaterally close the joint accounts which she held with the Metcalfs by permitting Lanahan to withdraw the funds in those joint accounts. Finally, there is no real dispute between the parties as to whether the remaining parts of the four-part test for applying nonmutual collateral estoppel were met. The judgment of the Circuit Court for Carroll County was final; the Metcalfs were parties to that adjudication; and the Metcalfs were given a fair opportunity to be heard on the issue in the Carroll County case. Consequently, we hold that the Metcalfs were precluded from relitigating the issue in the instant case.

### III.

When the established role of Buppert in the withdrawal of the funds in the joint account of Lanahan and the

Metcalfs is considered along with the evidence offered at the trial of the instant case, viewed in a light most favorably to the Metcalfs, there was no legally sufficient evidence of any breach by Leeds of its contracts with the Metcalfs when it permitted the funds in the joint passbook accounts to be withdrawn. Lanahan was the sole source of the funds in the accounts; she always maintained possession of the passbooks that were required to make withdrawals from the account; the contracts which Leeds entered with Lanahan and the Metcalfs expressly permitted any one of the joint owners to draw funds from the accounts without the consent of the other joint owners.

The Metcalfs reliance on *Wright v. Commercial Savings Bank,* 297 Md. 148, 464 A.2d 1080 (1983) is misplaced. In that case a husband and wife opened a joint checking account at a bank. The contract which the bank entered with them when the account was opened permitted either acting unilaterally to draw checks upon the account. The husband and wife subsequently separated, and the wife moved out of this state. When that occurred, the husband instructed the bank to remove his wife's name from the account, and the bank complied by crossing off the wife's name on the signature card with a notation of the date on which her name had been removed. The wife was not notified that her name had been removed from the account. A few months later the wife went to the bank and attempted to cash a check which she wrote upon the account. When the bank refused to allow her to draw a check against the account, she sued the bank and her husband. We held that the bank had no right to delete the wife's name from the joint account at the request of her husband. Judge Cole, writing for a majority of this Court, reasoned:

> "It seems to us that when two depositors open a joint checking account subject to withdrawal by either, each understands that at any given time the funds may be depleted by either. By the very nature of the account this risk is clear. It seems equally apparent to us that a depositor has no reason to believe that the bank at the

**122**

request of one and without the consent of the other will delete his name from the account and thereby deny him the opportunity and right to withdraw funds which might, as a matter of fact, represent money that he has deposited into the account. When the bank so favors one of its depositors, it breaches its contract with the other."

*Id.* at 156–57, 464 A.2d at 1085.

In contrast to the facts presented in *Wright,* in the case *sub judice* Leeds permitted the withdrawal of the funds in the joint accounts by Lanahan when presented with the passbook for the accounts and a writing signed by Lanahan requesting such action. The fact the passbooks and the writing were presented by Lanahan's authorized agent is of no consequence. The trial court erred when it denied Leeds' motion for judgment at the conclusion of the evidence.

*JUDGMENT REVERSED; COSTS TO BE PAID BY THE APPELLEES.*