394

656 A.2d 377

Richard BRIGHT, et al.

v.

LAKE LINGANORE ASSOCIATION, INC.

No. 1223, Sept. Term, 1994.

Court of Special Appeals of Maryland.

April 5, 1995.

Thomas E. Lynch, III (Earl W. Bartgis, Jr., John E. McCann, Jr., Miles & Stockbridge, Frederick, David R. Kinsley and Franch & Jarashow, P.A., Baltimore, on the brief), for appellants.

Eileen T. Basaman (Jeffrey Van Grack, Raymond B. Via, Jr., Kass, Skalet, Segan, Spevack & Van Grack, P.A., Rockville, Thomas A. Farrington, Ann Wittik–Bravmann and Farrington, Buchanan & Christian, Landover, on the brief), for appellee.

Argued Before FISCHER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Richard Bright, Dorothy Bright, Michael James, Valerie James, Brian Rice, Kathy Rice, Cynthia Izadi, and Mohammed Izadi, appellants, appeal a judgment of the Circuit Court for Frederick County (Rollins, J., presiding) that upheld the validity and applicability of certain covenants, restrictions, and servitudes in favor of appellee, Lake Linganore Association,

Inc. (an association of homeowners formed, in part, for the purpose of enforcing the covenants, including the collection of maintenance charges).[1] The trial court also imposed liens against the various lots belonging to appellants, pursuant to the Contract Lien Act. It additionally rendered judgment against the Izadis on a quantum meruit count.

Appellants presented five issues to us as questions. We list them as they were presented:

1. Whether the Circuit Court erred in denying Appellants' Motion for Summary Judgment and ruling against Appellants at trial when it failed to apply the doctrine of collateral estoppel to preclude relitigation by the LLA of issues dispositively resolved against the LLA in *Jurgens?*

2. Whether the Circuit Court erred by allowing the introduction of parol and other extrinsic evidence in the face of clear and unambiguous covenants and without a finding of ambiguity in those covenants?

3. Whether the Circuit Court erred, as a matter of law, when it found that covenants, which are inapplicable by their express terms, imposed a legal duty upon Appellants to pay LLA assessments as a consequence of the mere reference to those covenants in Appellants' deeds and other recorded instruments?

4. Whether the Circuit Court erred by interpreting the Maryland Contract Lien Act as allowing for the encumbrance of Appellants' property in the absence of a contract, and disallowing Appellants an award of their reasonable attorneys' fees?

5. Whether the Circuit Court erred, as a matter of law, by entering a personal judgment against Mohammed Izadi

1. There were originally at least four separate cases that were ultimately consolidated as one case. Additionally, one or more of the original cases may have been amended to effect a joinder of other parties. Ultimately, the trial court rendered one decision that applied to all the cases. We address the case in its ultimate posture.

and Cynthia Izadi under the mutually exclusive theories of breach of contract and quantum meruit?

We shall resolve those questions necessary to our affirmance of Judge Rollins's learned and well-reasoned opinion. We shall first address some of the facts.

### The Facts

Lake Linganore is a planned phased development in Frederick County, Maryland. One of the phases, if not the earliest phase, was known as "Pinehurst 1, Section 1 of Eaglehead." Early in the development of that section, the developer, the Linganore Corporation, recorded a document referred to as the Pinehurst Declaration. Recordation was effected by inclusion of the Declaration in a deed to James L. Philapy and Catherine Ann Philapy, their heirs and assigns, that was recorded among the Land Records of Frederick County, Maryland, in Liber 793, folio 370, describing the lot being conveyed to them. The habendum clause to that deed made that lot "subject to the following Declaration, containing ... covenants, which covenants are a part of the considerations ... and are hereby expressly agreed to bind the grantees herein for themselves, their heirs, legal representatives, assigns, and grantees, as covenants running with the land...." The Declaration, as we have said, was included in the body of the deed. The Declaration provided, in relevant part:

WITNESSETH:

WHEREAS, Declarant is the owner of the real property described in Article I of this Declaration and *desires to create thereon a community,* primarily residential in nature but with some provision for commercial uses, with a *community* lake, open spaces, roads, bridle paths and other common facilities for the benefit of the said *community;* and

WHEREAS, Declarant desires to provide for the preservation of the values and amenities in said *community* and for the maintenance of said lake, open spaces, streets, paths,

bridle trails, and other common facilities; and, to this end, desires to subject the real property described in Article I, *together with such additions as may hereafter be made thereto,* to the covenants, restrictions, easements, charges and liens hereinafter set forth, each and all of which are for the benefit of said property and *for each owner thereof, and shall inure to the benefit of and pass with said property,* and each and every parcel thereof, *and shall apply to and bind the successors in interest of any owner thereof;* and

. . . .

NOW, THEREFORE, the Declarant declares that the real property described in Article I, *and such additions thereto as may hereafter* be made, is and shall be held, transferred, sold, conveyed and occupied subject to the covenants, restrictions, easements, charges, and liens (sometimes herein referred to as "covenants and restrictions") hereinafter set forth.

. . . .

2. *Additions to Development. The Declarant may subject additional lands to this Declaration by recording a supplementary declaration of covenants and restrictions with respect to the additional property . . . . Such supplementary declaration may contain such additions to and modifications of the covenants . . . .*

Additionally, it contained numerous other provisions normally imposed in such declarations. Thereafter, subsequent phases of the general development were completed, including those phases (or the phase) in which the lots of the various appellants are located.

Appellants Richard and Dorothy Bright received their title to Lot 40, Coldstream Village, by deed from Terhane Group, Inc., recorded among the Land Records of Frederick County in Liber 1066, folio 488. The habendum clause of their deed stated that the Brights were to hold the lot to their use and to the benefit of them, "their heirs and assigns . . . but subject to all of the restrictions, conditions and covenants fully set forth in a deed from J. William Brosius to Linganore Corporation

... recorded ... in Liber No. 850, folio 248, and in a deed from Linganore Corporation to ... Brosius ... recorded in Liber No. 900, folio 252" in the land records of Frederick County. This last deed, recorded at Liber 900, folio 252, contained in its body what is referred to by the parties as the SanAndrew Declaration. The SanAndrew and Pinehurst Declarations, as relevant to the issues in the case at bar, are identical. We shall sometimes refer to the two of them as the "Original Declarations." The deed to the Brights noted expressly that the

> covenants are a part of the consideration hereof and are hereby expressly agreed to bind the Grantees herein for themselves, their heirs ... and assigns, and grantees, as covenants running with the land.

Terhane Group, Inc., acquired the property through two deeds. One was a confirmatory deed recorded at Liber 1024, folio 147 from Brosius Homes Corporation, Debtor in Possession, to Terhane, its successors and assigns, and was also executed by Terhane Group, Inc. The confirmatory deed noted that it was subject to the covenants, conditions, restrictions and covenants contained in a deed there referenced. That referenced deed was the other deed to Terhane from Brosius Homes Corporation recorded at Liber 1008, folio 419. It was also a two-party deed. This deed's habendum clause stated that Terhane was to hold the property to the benefit of itself "their heirs and assigns ... but subject to all of the ... covenants ... in ... deed[s] from ... Brosius to Linganore Corporation ... recorded ... in Liber 850, folio 248, and ... Liber 900, folio 252" (the SanAndrew Declaration deed) and again stated that those covenants were part of the consideration, were intended to bind the grantee, its successors and assigns, and were intended to bind the land, *i.e.,* "running with the land." The next relevant deed back in the chain of title as to Lot 40, "Coldstream," was a two-party deed "by and between" Linganore Corporation and Brosius Homes Corporation, its "heirs and assigns...." Its habendum clause again added the "heirs and assigns" language and noted that the land was

subject to the restrictions, conditions and covenants fully set forth in a deed from LINGANORE CORPORATION to James L. Philapy and Catherine Ann Philapy, his wife dated Nov. 6, 1969 and recorded in Liber 793 folio 370 . . . which covenants are a part of the consideration hereof and are hereby expressly agreed to bind the grantees herein for themselves, their heirs, legal representatives, assigns, and grantees, as covenants running with the land.

The Philapy deed contained the Pinehurst Declaration. Thus, this lot is subject to both of the Original Declarations. The deed then stated:

WITNESS the corporate name of the grantor . . . and the hands and seals of said grantees.

It was executed by Brosius Homes Corporation, the grantee. A notary noted that the appropriate officer of Brosius had appeared before him and acknowledged that Brosius "executed the [deed] for the purposes therein contained, and in my presence signed and sealed the same. . . ." As to Lot 40, Coldstream, part of the Brights' property, we shall refer to this last deed as the "Key Deed" in that chain of title.

The Brights acquired their Lot 39, Coldstream,[2] from Mark R. Diehl and Judith Diehl by deed recorded in Liber 1223, folio 53. That deed expressly stated that the lot was "SUBJECT, HOWEVER, to the . . . covenants fully set forth in" the Philapy deed that we have discussed above. The Diehls acquired Lot 39 directly from the Linganore Corporation by a two-party deed. This deed subjected Lot 39 to the covenants contained in two deeds, one from J. William Brosius to Linganore Corporation, recorded at Liber 850, folio 248, and the other, recorded at Liber 900, folio 252, between the Linganore Corporation and J. William Brosius. The latter deed also contained what we have referred to as the SanAndrew Declaration. Thus, this lot is subject to both of the Original Declarations. These prior deeds subjected the property to the covenants at issue. The deed between the Diehls and Linga-

---

2. The Brights have since merged and consolidated Lots 39 and 40.

nore Corporation was a two-party deed signed by the grantees as well as the grantor and contained language similar, if not identical, to that contained in the "Key Deed" to Lot 39. This deed is also what we will refer to as a "Key Deed" in the chain of title because it was executed by both the grantor and grantee.[3]

Appellants Michael and Valerie James acquired Lot 93, Block B, Plat 4, Eaglehead, Coldstream, Section 1, by deed from Clarence J. Hylton Jr. and Roberta J. Hylton, recorded at Liber 1513, folio 846.[4] It notes that the conveyance was "SUBJECT to covenants, easements and restrictions of record." The Hyltons had acquired the property from Joseph D. Baker by a deed recorded at Liber 1221, folio 715, which contained the express language that it was subject to the restrictions, conditions and covenants set forth in the original deed to the Philapys, *supra*, which, as we have said, incorporated the Pinehurst Declaration. The Baker–Hylton deed was a one-party deed. Baker had acquired the property from Samuel Steen by deed recorded at Liber 1110, folio 72 that also subjected the lot to the covenants and restrictions contained in the Philapy deed. Steen acquired the property by deed from the Woods recorded at Liber 1061, folio 818. It, too, contained the language subjecting it to the restrictions in the Philapy deed. The Woods acquired the property by two-party deed from Linganore Corporation recorded at Liber 813, folio 418. This deed contained all the pertinent language of the other "Key Deeds," including the fact that it was

---

**3.** By referring to it as the "Key Deed," we do not mean to imply that two-party deeds are necessary for imposing covenants running with the land. We identify them as "Key Deeds" because, under the circumstances of this case, they were, in and of themselves, supplementary declarations that would, as we shall indicate, satisfy the requirements of the original covenants for supplementary declarations. We, likewise, in explaining our use of the term "Key Deeds," do not mean to imply that any type of formal supplementary declarations are required in the first instance. Two-party deeds, as Judge Rollins opined, are not always necessary for the creation of real covenants.

**4.** Valerie's surname on this deed is "Wiers." She apparently later married Michael James.

subject to the covenants of the Philapy deed. As to Lot 93, it is, thus, a "Key Deed."

Appellants Mohammed Izadi and Cynthia Izadi acquired Lot 119, Block C, by deed from Ahamed Fourian and Mohammed Izadi dated August 24, 1990 (the recordation information is illegible in the Extract). The deed noted that it was subject to covenants, easements, and restrictions of record. Mohammed Izadi and Ahmed Fourian acquired the property by deed from A. Wayne Six and Karen Six recorded at Liber 1484, folio 281. It also noted that it was subject to covenants, easements, and restrictions, of record. The Sixes acquired the lot by deed from Randall P. Guiler recorded at Liber 1461, folio 819. This was a one-party deed, but contained the language that it was subject to the Philapy deed covenants. Guiler obtained sole title to the property by a "no consideration" deed from his wife. The Guilers acquired their lot by deed from Edward and Judith Ungar recorded at Liber 1148, folio 691. A one-party deed, it stated that the conveyance was subject to the covenants contained in the Philapy deed. The Ungars acquired the property by a two-party deed recorded at Liber 813, folio 420 from Linganore Corporation containing all of the subjecting language of the other "Key Deeds." As to Lot 119, it was itself a "Key Deed," signed by the Ungars for themselves, their heirs and assigns.

Appellants Kathy and Brian Rice acquired Lot 206, Coldstream Village, by a one-party deed from Robert Brown and Hubert Brown t/a Brown Properties recorded at Liber 1713, folio 1093. The deed noted that the conveyance was subject to the covenants, easements, and restrictions of record. The Browns acquired the property from Ellis P. Schlossnogle by deed recorded at Liber 1628, folio 0029. It noted that it was subject to the covenants, easements, and restrictions in a deed recorded at Liber 793, folio 370 (the Philapy deed). Schlossnogle acquired the lot from Robert Rankin and Carol Rankin by a one-party deed recorded at Liber 1206, folio 264. It was also made subject to the covenants contained in the Philapy deed. The Rankins acquired the property from Wilbur L. Brightbill and Ethel Brightbill by deed recorded at Liber

1002, folio 64. That deed also contained language subjecting the lot to the covenants contained in the Philapy deed. Additionally, it noted that the "covenants are a part of the consideration hereof and are hereby expressly agreed to bind the grantees herein for themselves, theirs heirs, legal representatives, assigns, and grantees, as covenants running with the land." The Brightbills acquired the property by a two-party deed from the Linganore Corporation recorded at Liber 813, folio 540. It, too, was a "Key Deed" as we have heretofore described them.

Each chain of title is subject to covenants contained in two-party deeds we have identified as "Key Deeds." The respective chains of title are as follows:

LOT 93

| JAMES |
| 1513/896 |

| HYLTONS |
| 1221/715 |

| BAKER |
| 1110/72 |

| STEEN |
| 1061/818 |

| WOODS |
| 813/418 |

| LINGANORE CORP. - WOODS |

"Key Deed"

LOT 119

| IZADIS |
| 24 August 1990 |

| FOURIAN and IZADI |
| 1484/281 |

| SIXS |
| 1461/819 |

| GUILER |
| 1148/691 |

| UNGARS |
| 813/420 |

| LINGANORE CORP. - UNGARS |

"Key Deed"

LOT 206

| RICES |
| 1713/1093 |

| BROWNS |
| 1628/0029 |

| SCHOSSNOGLE |
| 1206/264 |

| RANKINS |
| 1002/64 |

| BRIGHTBILLS |
| 813/540 |

| LINGANORE CORP. - BRIGHTBILLS |

"Key Deed"

Each of the "Key Deeds," *i.e.,* the deeds first subjecting each of the lots at issue in the case *sub judice* to either the "Pinehurst" Declaration or the "SanAndrew" Declaration, or both, was a two-party deed. Each contained language in the granting clause that the property was being conveyed to the grantees, "their heirs and assigns." In each of the habendum clauses, the deeds noted that the properties were to be held to the use and benefit of the grantees, "their heirs and assigns," but were "subject to the restrictions, conditions and covenants fully set forth in a deed from LINGANORE CORPORATION to James L. Philapy and Catherine Ann Philapy" dated November 6, 1968, and recorded at Liber 793, folio 370 and/or to the deed between Brosius and Lake Linganore Corporation recorded at Liber 900, folio 252. (One of the "Key Deeds"

refers not to the Philapy deed but to a deed recorded at Liber 850, folio 248 and is a two-party deed between Brosius and Linganore Corporation that itself subjects the property to the covenants in the Philapy deed.)  Each of the "Key Deeds" notes that the covenants imposed were part of the consideration and were "expressly agreed to bind the grantees herein for themselves, their heirs, legal representatives, assigns, and grantees, as covenants running with the land."  Each of the "Key Deeds" further contained a notarized acknowledgement by the grantees that they had executed the document for the purposes set forth therein.

We shall now address those questions presented that are necessary to a final resolution of the matter.  We rephrase some of them to an objective form where required.  We may not address them in the order presented—or necessarily address all of them.

## The Questions

### 1.

WHETHER THE CIRCUIT COURT ERRED IN DENYING APPELLANTS' MOTION FOR SUMMARY JUDGMENT AND RULING AGAINST APPELLANTS AT TRIAL WHEN IT FAILED TO APPLY THE DOCTRINE OF COLLATERAL ESTOPPEL TO PRECLUDE RELITIGATION BY THE LLA [LAKE LINGANORE ASSOCIATION] OF ISSUES DISPOSITIVELY RESOLVED AGAINST THE LLA IN *JURGENS*[.]

■  The prior "Jurgens" case began as a collection case in the District Court.  It was appealed to the circuit court.  That court reversed the District Court on a ground not resolved by the District Court, and not, as we shall indicate, properly raised in that lower court.

In *Klein v. Whitehead*, 40 Md.App. 1, 15–19, 389 A.2d 374, *cert. denied*, 283 Md. 734 (1978), we noted:

Collateral estoppel does not require that the causes of action be the same, but it applies only with respect to issues of fact actually determined in the earlier proceeding.

. . . .

Before considering that theory, however, we should discuss the ground relied upon by the lower court—that of collateral estoppel. For that doctrine to apply, we must conclude that the issues raised in this proceeding were actually litigated in the earlier actions (*or that the facts necessary to resolve these issues were adjudicated in those actions* ). This we are unable to do. [Emphasis added.] We note that:

Nonmutual collateral estoppel can be invoked offensively or defensively. It is used offensively when a plaintiff attempts to bar a defendant from relitigating an issue the defendant previously litigated unsuccessfully in another action against a different party. Defensive use of nonmutual collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue which the plaintiff previously litigated unsuccessfully in another action against a different party.

*Leeds Federal Savings and Loan Ass'n v. Metcalf,* 332 Md. 107, 115–16, n. 4, 630 A.2d 245 (1993) (citation omitted).

In *Leeds,* the Court of Appeals noted that it had first embraced the exception to the usual rule, that a party seeking to utilize collateral estoppel against another party had to have been a party to the earlier litigation (as well as the party sought to be collaterally estopped), in *Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968). We look, therefore, to *Pat Perusse* to see what limitations, if any, were applied when the exception was first created in Maryland.

In *Pat Perusse,* parties involved in domestic difficulties sought to sell their property and listed it for sale. The wife later refused to consummate a sale in reference to a contract allegedly produced by the real estate broker. The broker sued the husband and wife but, having personally served the husband only, proceeded against him alone for the payment of the commission. The broker was unsuccessful in her cause when the trial court found that the broker had not produced the buyer.

Thereafter, the broker sought to collect the same commission on the same facts from the wife. The wife defended on grounds of *res judicata.* Realizing that the wife had not been properly made a party in the prior litigation, the court initially noted that "[t]he rule of mutuality always has had exceptions, modifications and extensions . . . ." *Id.* at 35, 238 A.2d 100. "The wall of mutuality never having been solid, the likely has happened and courts have gradually widened the breaches." *Id.* at 36, 238 A.2d 100.

The Court in *Pat Perusse* quoted extensively from *State of Maryland v. Capital Airlines, Inc.,* 267 F.Supp. 298, 303–04 (D.Md.1967), including:

> Four questions must be answered in the affirmative in order for the doctrine of collateral estoppel to be applicable . . . . "[1] Was the issue decided in the prior adjudication identical with the one presented in the action in question? [2] Was there a final judgment on the merits? [3] Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" [4] Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue? ·

*Pat Perusse,* 249 Md. at 45, 238 A.2d 100. The Court of Appeals then adopted the exception for Maryland.

In the case *sub judice,* it appears clear that the Association was the identical party in the prior *Jurgens* case (that we shall address, *infra* ). It is equally clear that the judgment there rendered was a final judgment. The questions quoted in *Pat Perusse* that remain as we shall hereafter address the issue of collateral estoppel are: (1) whether the issue was identical; and (2) whether the Association had a full and fair opportunity to be heard on the issue.

### The Prior *"Jurgens"* litigation

In our examination of that case, we are limited to what is included in the record in this case about that case. We shall summarize it as concisely as possible. Its evidentiary stage, as we have indicated, initially involved a simple District Court

collection proceeding and decision. The appeal from the District Court decision to the circuit court was an on-the-record appeal. With that in mind, the *identity of the issues* must perforce relate back to the issues raised in the District Court and the issues in *that District Court case* must be identical to the issues presented in this case in the circuit court and now before us on appeal. We also shall consider both the *Jurgens* District Court and the circuit court proceedings to determine whether the Association had a full and fair opportunity to litigate that issue.[5]

The Jurgenses did not present any opening statement or any defense before the District Court. In closing argument, their main thrust was that the covenants did not bind the property of the Jurgenses because the Jurgenses had not signed their deeds. During an extensive argument on that issue and the issue of limitations, the Jurgenses' counsel inserted one phrase, that we hereafter emphasize:

> Mr. and Mrs. Jurgens did not sign anything.... They are not bound to these covenants.... [T]hat I submit is conclusive of the case.... I would make it as a matter of argument that those covenants ... by their own terms.... *[T]hey do not apply to Pinehurst*.... Now there is ... nothing in this case, which would make applicable any statute of limitations....

The Jurgenses' argument included extensive other discussion both prior to and after that which we have furnished above. That phrase we have emphasized is the only reference to the issue that appellants now assert is foreclosed by reason of collateral estoppel.

After hearing from the LLA's counsel, the court then acknowledged that it was leaning towards accepting the assertion proffered by the Jurgenses' counsel that, because the Jurgenses had not signed their deed, the restrictions in prior

---

5. We note that we have been unable to find in the extract the actual claim filed in the District Court in the prior *Jurgens* case.

instruments were not binding on them.[6]  The District Court then informed the parties that it was going to allow the Association an opportunity to research and address the issue of whether the deed had to be signed by the Jurgenses, but limited the Association by saying, "But I'm not going to leave the case open for you to file additional information or materials to bolster the Plaintiff's position."

After the reconvened hearing, the District Court then ruled that the assessment could be increased: "I'm going to rule in favor of the Plaintiff [the Association] on that point."  It went on to state:

> I'm going to rule that the limitations are not [a] proper defense.  I'm going to allow the Plaintiff to make its claim then for the entire period. . . .
>
> . . . .
>
> . . . [T]he Court will issue this then as a *nisi* judgment in favor of the Plaintiff as against both Defendants.  Mr. Price [Jurgenses' counsel], I think without the real property code section[7], that it may have been [a] . . . different ball game.

The District Court in its decision did not consider the general applicability of the covenants.  The Jurgenses then took an appeal to the circuit court.

Thereafter, in the circuit court, Mr. Price asserted that the record before the District Court reflected that there were "no covenants applicable to the defendants' lot or, indeed, to any lot . . . in Pinehurst Section I."  The circuit court immediately responded:

---

6. Neither the District Court nor the circuit court ever made any reference to prior deeds in the chain of title that had been signed by the grantee's predecessors.

7. Maryland Code (1974, 1988 Repl.Vol.), § 4–102 of the Real Property Article provides: **Deed poll** "If a deed contains a covenant by the grantee . . . and is signed only by the grantor (deed poll), *the acceptance of delivery of the deed by the grantee binds the grantee to the provisions in the deed as effectively as if he had signed the deed as a grantee.*" (Emphasis added.)

I think you're absolutely right, in which case how did the District Court judge arrive at the decision he arrived at?

MR. PRICE: I don't know that, Your Honor. . . .

Mr. Price went on to argue, in part: "[T]here is nothing to show that the plaintiffs' lot . . . is subject to these covenants. . . ." The court then interrupted him and the following transpired:

THE COURT: Well, they can add additional covenants . . . but it tells you specifically how they're to do it.

MR. PRICE: Specifically how to do it, and I submit . . . that that is the exclusive way, because not anybody and everybody can just inject another piece of property into the Linganore development plan.

The matter of how the property could be subject to the restrictions and whether it was done properly had never been adequately presented to the District Court. The correctness *vel non* of subjecting subsequent phases of the development to the master declaration by a declaration in a deed for a lot in that subsequent phase, declaring that the subsequent lot is subject to the recorded covenants contained in a deed in an earlier phase of the development, had never been adequately presented or argued to the District Court. The District Court had not based its decision upon any consideration of that issue. Later, the circuit court asked Mr. Winegar (Lake Linganore's counsel) to try first to persuade it, "if you can, that these covenants are applicable to Mr. Price's clients." Mr. Winegar then—for the first time—because the issue had never been presented before the District Court—argued the general applicability of the covenants "and that's what was done . . . incorporating covenants by reference. . . ."

What occurred, and has occurred in all of the present transfer transactions in the case *sub judice,* is that the Jurgenses' lot was encumbered, not by a reference in another deed, but by a reference in *its* deed to the covenants set out in full in another deed. In other words, it was what we have previously referred to as the "Key Deed", a deed in the Jurgenses' chain of title, that imposed the restrictions by

incorporating language contained in another recorded instrument. It was the language in the Jurgenses' deed, not some other deed, that declared the Jurgenses' lot to be subject to the restrictions set out elsewhere.

During the circuit court's exchange with the Association's counsel, it was pointed out by counsel that this issue had not been sufficiently raised below. Mr. Winegar stated:

> [B]ut its [sic] beyond ... the scope of the trial, but I'll be happy to attempt to [address the issue not raised below].
>
> . . . .
>
> THE COURT: Where are you going to find them? They've only been imposed on Section I?
>
> . . . .
>
> MR. WINEGAR: ... [A]gain, this is outside the scope, but you will find them [supplementary declarations] when this lot ... was first granted by the developer to whoever was in title, I mean whoever was the first grantee, [the "Key Deed" grantee] when he specifically says, "This property is being conveyed to you subject to the restrictions and covenants found at". . . .

The circuit court initially reversed the District Court judgment on the sole ground that the District Court lacked jurisdiction to have heard the case in the first instance. That circuit court judgment was, in turn, reversed by the Court of Appeals, *Lake Linganore Ass'n v. Jurgens,* 302 Md. 344, 488 A.2d 162 (1985), which held that the District Court did, in fact, have jurisdiction. On remand, the circuit court again reversed the District Court but only addressed, erroneously, the applicability of the covenants themselves, an issue never sufficiently raised in the District Court.

## Conclusion on Collateral Estoppel

The appeal to the circuit court, as we have said, was an on-the-record appeal. The issue upon which the circuit court based its opinion was not, as we have indicated, sufficiently raised by one sentence in an extended argument in a collection case before the District Court. Additionally, that issue was

not even addressed by the District Court in its decision and was not there resolved. In sum, the issue was not properly before the circuit court.

The issue *properly* before the circuit court in *Jurgens* did not include the issue that is currently being litigated in the case *sub judice*. Thus, we decline in the first instance to find that identical issues *were ever properly litigated* in the *Jurgens* case because, generally, an appeal is limited to the issues raised and decided in the lower court and, generally, it is inappropriate to address and resolve issues neither properly presented to, nor resolved by, the lower court. *See Davis v. DiPino*, 337 Md. 642, 655 A.2d 401 (1994); *County Council v. Offen*, 334 Md. 499, 508, 639 A.2d 1070 (1994); Maryland Rule 8–131(a). Moreover, at the very least, the *Jurgens* case fails to satisfy the fourth requirement of collateral estoppel, that the litigant against whom collateral estoppel is a being asserted must have had a full and fair opportunity to have been heard on the issue in the prior litigation. We do not perceive that the Association was afforded such an opportunity. For the reasons we have noted, we hold that appellee was not collaterally estopped from litigating the issue in this case.

### 3.

WHETHER THE CIRCUIT COURT ERRED, AS A MATTER OF LAW WHEN IT FOUND THE COVENANTS IMPOSED A LEGAL DUTY UPON APPELLANTS TO PAY THE LAKE LINGANORE ASSOCIATION, INC., FEES, ASSESSMENTS AND CHARGES BECAUSE OF DECLARATIONS AND OR SUPPLEMENTAL DECLARATIONS, FOUND IN DEEDS IN THE VERTICAL CHAIN OF TITLE TO THE RESPECTIVE PROPERTIES OF APPELLANTS?

In responding to this question, we note that in our case of *Gallagher v. Bell*, 69 Md.App. 199, 516 A.2d 1028 (1986), we discussed extensively the concept of the law of real covenants applicable here. We shall discuss *Gallagher, infra*. As we do not perceive any substantive change since *Gallagher*, we shall

not repeat most of its holding here. We shall discuss to some extent the interpretation of deeds, privity, and the meaning and implications of the term, "chain of title."

## The Construction of Deeds of Conveyance

■ In *Mims v. Armstrong,* 31 Md. 87, 95–98 (1869), the Court dealt with a deed of assignment by which a debtor assigned his property for the benefit of creditors. The property was described in a schedule annexed to the deed. Thereafter, a controversy arose as to whether property not described in the schedule would nevertheless pass under the general provisions of the deed. The Court opined:

> [W]e must suppose that the grantor had a purpose in the more particular description.... To withhold this meaning from the words of reference to the schedule is to deny to them all import whatever; and that is justified by no rule of construction.
>
> . . . .
>
> ... [I]n a legal instrument every word used is entitled to have its proper and ordinary meaning considered in the construction.... The words were certainly intended to have a meaning, and if so, we must attribute to them their ordinary signification. [Citations omitted.]

Shortly thereafter, the Court of Appeals revisited the law of interpretation that remains viable today, when it opined, in *Maryland Coal Co. v. Cumberland & Pennsylvania Railroad Co.,* 41 Md. 343, 352 (1875):

> In the interpretation of written contracts it is the duty of courts to ascertain, if possible, the intention of the parties, as manifested by the terms of the instrument. If the intention ... is plainly manifest upon the face of the instrument there is no room for interpretation.... The rule is well settled that, in ascertaining the meaning of words in a deed or other written instrument, technical words must be given their technical meaning and signification.

See also *Bishins v. St. Barnabas Corp.,* 221 Md. 459, 463, 158 A.2d 94 (1960).

"... [I]n the construction of deeds ... the intention of the parties shall prevail unless it violates or infringes some established principle of law. To ascertain this meaning and intent of the parties resort must be had to the whole deed *that every word of it may take effect and none be rejected....*"

*Logsdon v. Brailer Mining Co.,* 143 Md. 463, 474–75, 123 A. 113 (1923) (emphasis added, citations omitted). *See also Adams v. Parater,* 206 Md. 224, 236, 111 A.2d 590 (1955) ("the intention of the parties as determined from the whole deed given effect"); *Needy v. Middlekauff,* 102 Md. 181, 184, 62 A. 159 (1905). The Court in *Watson v. Raley,* 250 Md. 266, 268–69, 242 A.2d 488 (1968), in which an inconsistency in a clause of a deed was alleged, noted, "[T]he only rule of construction to which the Court adheres ... is that the intentions of the parties should prevail.... [W]e may view the language employed in light of all of the facts and circumstances of the transaction." (Citations omitted.) *See also Delphey v. Savage,* 227 Md. 373, 378, 177 A.2d 249 (1962); *Brown v. Whitefield,* 225 Md. 220, 225–26, 169 A.2d 920 (1961); *Whittington v. Mann,* 211 Md. 199, 207, 126 A.2d 617 (1956) ("not necessary to construe the language of the ... deeds strongly against the grantor ... since this rule of construction need be referred to 'only where all other rules ... fail to reach ... the intention of the parties'"); *McKenrick v. Savings Bank,* 174 Md. 118, 128, 197 A. 580 (1938) (Even when covenants do not expressly provide words of inheritance or running with the land language, "if ... it was the intention ... that the restrictions were part of a uniform general scheme or plan ... which should affect the land granted and ... retained alike, they may be enforced in equity...."); *Legum v. Carlin,* 168 Md. 191, 194, 177 A. 287 (1935) ("Where the intention is clearly ... manifested by the language used ... it will be gathered from the words used. But where the contract is open to construction ... the court may consider the circumstances *as the parties viewed them....*") (citations omitted, emphasis added); *Hammond v. Hammond,* 159 Md. 563, 566, 152 A. 107 (1930); *Neavitt v. Lightner,* 155 Md. 365, 375, 142 A. 109

(1928), quoting *Maryland State Fair v. Schmidt,* 147 Md. 613, 621, 128 A. 365 (1925), ("[T]o ascertain its true meaning the situation of the parties and the circumstances attending the execution of the deed may be considered.").

> [I]n the construction of deeds ... the intention of the parties shall prevail unless such intention infringes some established principle of law. To ascertain this meaning and intent, we must look to the whole deed.... [T]he court should take into consideration the language employed, the subject matter, and surrounding circumstances.

*Weiprecht v. Gill,* 191 Md. 478, 484–85, 62 A.2d 253 (1948).

A strict construction rule formerly applied in construing the meaning of the covenants and restrictions contained within a declaration of restrictions. "[W]here the language employed in a restrictive covenant requires construction, it must be strictly construed." *Trunck v. Hack's Point Community Assoc.,* 204 Md. 193, 196, 103 A.2d 343 (1954) (emphasis added). *See also Martin v. Weinberg,* 205 Md. 519, 526–27, 109 A.2d 576 (1954) ("We have frequently ... applied the rule of strict construction in favor of the unrestricted use of property. But this does not mean that language must be so narrowly construed as to defeat its general purpose." (citations omitted)).[8] Whether, however, a declaration of restrictions even exists in the first instance, and is applicable to a property, as distinguished from the meaning or interpretation of a restriction, is first determined by both the language of the declaration *and* the intentions of the parties.

In *Adams v. Parater,* 206 Md. 224, 229–30, 111 A.2d 590 (1955), when referring to the deed at issue there, the Court noted:

---

**8.** We noted in *Markey v. Wolf,* 92 Md.App. 137, 153, 607 A.2d 82 (1992), a case primarily construing the meaning of covenants, a trend towards the modern "reasonableness" rule and then considered that the Court of Appeals had appeared to adopt the reasonableness rule in some fashion in *Belleview Construction Co. v. Rugby Hall Community Association, Inc.,* 321 Md. 152, 582 A.2d 493 (1990).

Some question has been raised as to whether any evidence other than the deed itself may be considered in construing it. We think that there is no doubt that the existence of a general plan of development may be shown and that the right of other property owners to enforce a covenant by which they are benefited may be shown by inference from sources outside the deed.

The Court added:

It would be incorrect to say that the absence of an expression of the intention is decisive. And it would be incorrect to say that any ground of valid inference must be disregarded. An inference which appears with sufficient clearness from any source should be accepted. ... The allegations of the bill as to the existence of a general plan are, accordingly, to be considered as well pleaded and hence may be taken into consideration in passing upon the appellees' demurrer to the bill. The fact that a few lots are not subject to restrictions is not fatal to the existence of a general plan. *Schlicht v. Wengert, supra* [178 Md. 629, 15 A.2d 911 (1940) ]; *Martin v. Weinberg,* 205 Md. 519, 525, 109 A.2d 576, 578. *It is not ... necessary to rely upon the existence of a general plan if the promises can be implied from the deeds and surrounding circumstances.*

. . . .

Another and more fundamental rule, we think, is involved-that unless some positive rule of law is contravened, *every part of a deed is to be given effect, if possible, and the intention of the parties must prevail.*

*Id.,* 206 Md. at 230–31, 111 A.2d 590 (emphasis added, some citations omitted).

This Court upheld the applicability of restrictions in *Guilford Ass'n, Inc. v. Beasley,* 29 Md.App. 694, 700, 350 A.2d 169, *cert. denied,* 277 Md. 735 (1976), where we noted:

The courts, it would seem, are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a

different construction.... [C]ourts ... must consider the circumstances surrounding the parties at the time the covenant was made....

## Real Covenants—Privity of Estate

One of our leading cases involving real covenants is *Gallagher v. Bell*, 69 Md.App. 199, 202, 516 A.2d 1028 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987), where the Gallaghers, as buyers, promised in a contract of sale "to dedicate half of streets ... and shall share pro-rata cost of installing street and utilities...."[9] The contract would be binding on the principals and their respective "heirs, successors, and assigns and ... its provisions would 'survive the execution and delivery of the deed ... and shall not be merged therein.'" *Id.*, 69 Md.App. at 203, 516 A.2d 1028. These provisions were inserted in the Gallagher contract because of provisions in a prior conveyance from the same grantor to the Bells, who became, by reason of the two conveyances, owners of abutting property. The Bells were developers who had purchased their property for a proposed subdivision. In spite of the provisions contained in the contract of sale, the Gallaghers' deed made no mention of the above promises. Nevertheless, the Gallaghers entered into a direct agreement with the Bells (with whom, as we have mentioned, they shared a common grantor) to do that which the Gallaghers had earlier promised to do in the original contract of sale.

Thereafter, the Gallaghers sold their property to a Ms. Camalier, who insisted that they indemnify her for expenses in respect to the road improvements. Ultimately, the Bells filed suit against the Gallaghers for reimbursement for a pro rata share of road expenses.[10]

---

**9.** Judge Wilner, for the Court, furnished a perspective from what is sometimes referred to as "the Rule in *Spencer's Case*," 77 Ency.Rept. 72 (QB 1583), up to the time of the *Gallagher* decision, providing a complete review of the many aspects of covenant law. For an even more complete understanding of the law of covenants in Maryland *see Gallagher*, especially its discussion of horizontal and vertical privity.

**10.** We declined to address the indemnification issue.

We noted, initially, that, in respect to land conveyances, "[c]ovenants . . . may be regarded as being either personal in nature or as running with the land." *Id.* at 206, 516 A.2d 1028. The difference, we opined, depended on whether burdens and benefits of the promises made "can devolve upon" the promisors' successors in title. We then described how conflicts over covenants generally arise, specifically, "when either the party seeking to enforce . . . or when the party against whom enforcement is sought" is neither the original covenantee or covenantor, respectively. We noted, however, that the Gallaghers and Bells were, or at least could be deemed to be, original contracting parties, because the Gallaghers were being requested to perform under their contractual agreement with the Bells. That agreement was subsequent to the Gallagher's original contract of sale. It was also subsequent to their deed and to the original contract between the common grantor and the Bells.

As relevant to the case *sub judice,* we noted that covenants to pay money for the maintenance of services relating to the land clearly, in our view, touched and concerned the land. We also stressed the importance of the parties' intent that covenants run with the land and opined that that intent may be determined from the language contained in the agreement or from other *indicia.* We discussed that the Bells had made their intentions clear when they insisted that the common grantor include restrictions in the conveyances of the land subsequently conveyed to the Gallaghers. We noted that the covenant in the contract of sale included those restrictions; that the covenant expressly extended to the Gallaghers' assigns; that it was intended to benefit the land retained by the covenantee;[11] that the charges and dedication of a portion of the parcel for road purposes required by the covenant might not be incurred until after the Gallaghers no longer possessed the property; and that both original parties had maintained

---

11. Actually, it benefited the land retained, which had by them been contracted to the Bells, and the subsequent agreement between the Bells and the Gallaghers continued (or reaffirmed) the benefit to the lands, then owned by the Bells.

that the covenants ran with the land. We held that the parties to the covenants intended that they bind the land and the assigns by running with the land.

We then discussed the "modern view" of privity that abolished the requirements of both horizontal and mutual privity, retaining only the requirement of vertical privity, *i.e.,* the person receiving the benefit or bearing the burden of the covenant is a successor in title to the original covenantor or covenantee. *Id.* at 216–17, 516 A.2d 1028. We saw nothing precluding the adoption of the "modern view" and, though not in express language, applied that view by stating that "vertical privity" focused on devolutional relationships, where we perceived "the focus should be." *Id.* at 217, 516 A.2d 1028.

While our cases have discussed vertical privity, perhaps one of the simplest explanations of the difference between "vertical" and "horizontal" privity is found in the North Carolina covenant case of *Runyon v. Paley,* 331 N.C. 293, 416 S.E.2d 177, 184–85 (1992):

> [M]ost states require two types of privity: (1) privity of estate between the covenantor and covenantee at the time the covenant was created ("horizontal privity"), and (2) privity of estate between the covenanting parties and their successors in interest ("vertical privity")....
>
> . . . .
>
> ... The mere fact that defendants and plaintiff ... did not acquire the property directly from the original covenanting parties is of no moment. Regardless of the number of conveyances that transpired, defendants and plaintiff ... have succeeded to the estates then held by the covenantor and covenantee, and thus they are in vertical privity....

The covenantor's successors in *Runyon* argued that the covenants were unenforceable because they contained no express language asserting that they were enforceable by and against the covenanting parties. The North Carolina Supreme Court noted that such provisions in a deed are advisable but not required, stating:

Where ... the restriction is contained in the chain of title, we have not hesitated to enforce the restriction against a subsequent purchaser when the court may reasonably infer that the covenant was created for the benefit of the party seeking enforcement.

*Id.,* 416 S.E.2d at 191. *See also Moseley v. Bishop,* 470 N.E.2d 773, 776–77 (Ind.App. 4th Dist.1984); *Orange and Rockland Util., Inc. v. Philwold Estates, Inc.,* 52 N.Y.2d 253, 437 N.Y.S.2d 291, 295, 418 N.E.2d 1310, 1314 (1981) (party seeking to enforce covenant "need show only that he held property descendant from the promisee which benefited from the covenant and that the owner of the servient parcel acquired it with notice of the covenant" (citation omitted)); *Neponsit Property Owners' Assoc., Inc. v. Emigrant Industrial Sav. Bank,* 278 N.Y. 248, 15 N.E.2d 793, *rehearing denied,* 278 N.Y. 704, 16 N.E.2d 852 (1938) (in respect to an association not owning property but being charged with enforcing covenants even though technically no privity of estate existed); *Selected Lands Corp. v. Speich,* 702 S.W.2d 197, 199, *rehearing denied,* 709 S.W.2d 1 (Tex.App. 1 Dist.1985); *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 627 (Utah 1989); *Albright v. Fish,* 136 Vt. 387, 394 A.2d 1117, 1120–21 (1978). In the case *sub judice,* vertical privity, at the least, is clearly present.

The charges imposed by the covenants require the owner of the lots at issue in the case *sub judice* to compensate Lake Linganore Association for the maintenance and use of certain facilities and areas of the larger tract. After a sale of a particular lot, the seller is no longer obliged to pay the future servitude charges; the obligation to pay is transferred through the chain of title to the new owners. As we have said, vertical privity of estate exists. Thus, the charge at issue follows the land (the lots); it runs with and binds the land. This is further evidenced by the general plan of development, discussed in greater detail, *infra,* and by the language of the Key Deeds, and other deeds, declaring the covenants to run with the land.

Nevertheless, as discussed in *Mercantile–Safe Deposit & Trust Co. v. Mayor of Baltimore,* 308 Md. 627, 637, 521 A.2d 734 (1987), even a covenant that, by its very terms, runs with the land may not be enforceable if the parties creating the covenant intend that it not run. In the case at bar, however, there is absolutely no evidence that any of the original covenanting parties intended that the covenants not apply. Indeed, *all* of the credible evidence is to the contrary. Moreover, in the case *sub judice,* the deed in the respective appellants' chains of title in which the covenants were created, the "Key Deeds," contained a provision that the appellants' covenanting predecessors, and their heirs and assigns, which includes appellants, were to be bound by the covenants. The Court in *Mercantile* acknowledged that "use of that word ["assigns"] is, under the Maryland cases, *virtually conclusive evidence of intent* that the covenant run with the land, absent specific language to the contrary." *Id.* at 639, 521 A.2d 734 (emphasis added). *See also Ford v. Union Trust Co.,* 196 Md. 112, 115, 75 A.2d 113 (1950); *Huff v. Duncan,* 263 Or. 408, 502 P.2d 584, 586 (1972).

In the case *sub judice,* the restrictions not only bind the grantee but are stated to *run with the land.* Moreover, the documents in which the restrictions are contained, *i.e.,* the "Key Deeds," incorporate, through the subjection language, those restrictions that run with the land, and the "Key Deeds," which make the lots at issue "subject to the ... covenants fully set forth in [the Declaration] ... which ... are ... [made] a part ... hereof," adopt the provisions of the "Original Declarations" that contain further expressions indicative of an intent that the covenants run with the land. The Original Declarations include:

Declarant desires ... to subject the real property described in Article I ... to the covenants ... charges and liens hereinafter set forth ... for the benefit of said property and for each owner thereof ... and shall ... bind the successors in interest of any owner thereof....

... Declarant has deemed it desirable ... to create an agency [to enforce] ... [and collect] ... charges....

The Original Declarations then describe the property subject to the restrictions by reference to a plat. They also provide for the subjection of additional property to the declarations by "recording a supplementary declaration of covenants ... with respect to the additional property...." The "Key Deeds" all contain this supplementary declaration.

## Chain of Title

Having discussed the construction, or interpretation, of deeds in a general sense, we now discuss what is meant by, and the effect of, the term of art customarily referred to as "chain of title" in the context of the encumbrancing of property by real covenants. While enforcement of covenants at law and the enforcement of covenants in equity may differ depending upon the circumstances, the chain of title implications remain the same under either form of action.

In the case of *Kleis v. Katcef,* 160 Md. 627, 154 A. 558 (1931), Katcef acquired property by a recorded deed that made the conveyance subject to certain restrictions therein set forth. On the same day that he acquired the property, Katcef conveyed the property to the Greengolds and later reconveyed it to them by corrective deed, which declared that the prior deed was subject to the restrictions set out in the new corrective deed. Thereafter, the Greengolds conveyed to the Phippses, who conveyed the property to Purvis, still noting that the conveyances were subject to the restrictions set out in the original conveyance. Purvis thereafter conveyed the property (or a portion thereof) to the Kleises. The Purvis–Kleis deed recited that it was subject to the restrictions contained in the corrected deed to the Greengolds.

The Kleises began to use the property contrary to the restrictions. Litigation ensued, and they were unsuccessful at the trial court level. On appeal, the Kleises argued that the restrictions did not bind them under the terms of the conveyance. The Court noted:

"... In order to answer that inquiry in the affirmative we should have to discover *in the terms of the deeds,* or in satisfactory proof of a uniform plan of development, an

intention that the covenants should bind all portions of the land."

*Id.* at 631, 154 A. 558 (quoting from *Bealmear v. Tippett,* 145 Md. 568, 125 A. 806 (1924)). The Court emphasized the importance of the concept of chain of title obligation in the context of notice by discussing the fact that the deeds in the chain of title to the Kleises contained references to the restrictions and that the Kleises "not only had constructive but actual notice of the conditions and restrictions under which the lots they now own were sold by . . . [Katcef's predecessor in interest]." *Id.,* 160 Md. at 633, 154 A. 558 (citation omitted). The Court went on to note that

"... notice to a purchaser necessary to render the agreement enforceable against him in equity ... may be either actual or constructive. He is ... charged with notice of anything ... imposing such a restriction which may be contained in a conveyance in the chain of title under which he claims."

*Id.* The court continued:

"... [T]he question is one of fact to be determined by the intention of the vendor and of the purchasers, and that it is to be determined upon the same rules of evidence as other questions of intention."

*Id.*

The Court then discussed the fact that, when the words relating to restrictions bind both the grantees and grantors through the use of "heirs and assigns" language applicable to each party, the language is sufficient to cause a covenant to run with the land. But then, citing *Clem v. Valentine,* 155 Md. 19, 141 A. 710 (1928), it noted *Clem's* holding that, while the intention to have a covenant run with the land would be established by the use of that language, it did "... not follow that this intention cannot be shown otherwise." *Id.,* 160 Md. at 635, 154 A. 558. *See also Martin v. Weinberg,* 205 Md. at 525, 109 A.2d 576.

The Court in *Steuart Transp. Co. v. Ashe,* 269 Md. 74, 88–89, 304 A.2d 788 (1973), quoting from *McKenrick,* 174 Md. at

126, 197 A. 580, noted that "... recordation of a deed subjecting land to restrictions afforded constructive notice thereof to all persons dealing with the property.... [S]uch notice was sufficient to charge such persons with liability in respect to the restrictive covenants." The Court also pointed out that the appellant had purchased his property by deeds that did not refer specifically to the restrictions contained in prior documents in the chain of title. The Court did note, however, that references to the recorded documents containing the restrictions "appear[ed] in the direct chain of ... title to that lot." *Id.*, 269 Md. at 94, 304 A.2d 788. The Court further commented that that case presented, because of the reference in the chain of title, an even "stronger" case for notice than *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855 (1955), which had held that constructive notice existed regardless of whether the restriction appeared in the "direct chain of title or not." *Id.* The Court then quoted from *Turner v. Brocato:*

"... [T]he land records afforded constructive notice.... There are decisions [in other jurisdictions] holding that constructive notice is afforded only by a warning in the direct [vertical privity] chain of title.... On the other hand, ... in ... the Pennsylvania case ... the Court held that restrictions referred to in deeds from the same grantor of other lots gave constructive notice to the purchaser [horizontal privity]. This Court has agreed with the Pennsylvania Court...."

*See also Turner v. Brocato, supra; Markey v. Wolf,* 92 Md.App. 137, 607 A.2d 82 (1992); *Liu v. Dunnigan,* 25 Md. App. 178, 185, 333 A.2d 338, *cert. denied,* 275 Md. 752 (1975) ("The 1953 deed containing the covenants was ... recorded.... [It] provided constructive notice ... [that] the covenants are binding against them."); *Carranor Woods Property Owners' Assoc. v. Driscoll,* 106 Ohio App. 95, 153 N.E.2d 681, 686 (1957); *Selected Lands Corp. v. Speich,* 702 S.W.2d 197, 200, *rehearing denied,* 709 S.W.2d 1 (Tex.App. 1 Dist.1985).

We thus summarize chain of title notice as follows: An owner's "chain of title" is simply the preceding recorded deeds (or other instruments of transfer, such as a will) going back in

time, in order, *i.e.*, the last recorded to first recorded instrument. In Maryland, these deeds or instruments are generally found in the public land records, testamentary records, Orphans' Court records, and judgment and lien records of the particular county wherein the land is located. A subsequent owner, therefore, has notice of what is contained in his or her actual chain of title even if he or she has never seen it, heard it, or even imagined that it existed.

## Conclusion as to Express Covenants

As we have indicated elsewhere, appellants refer to the language of the Original Declarations (the Pinehurst Declaration and the SanAndrew Declaration) as imposing a requirement that there be a supplementary declaration in order to subject additional phases of the Lake Linganore development to those prior covenants. Appellants, at every stage, have failed to realize that the original imposition of restrictions was accomplished, as is done in many instances throughout this State, by incorporating them in the early deeds of conveyance, *i.e.*, the "Pinehurst Declaration" within the Philapy deed, the "SanAndrew Declaration" within the Brosius/Linganore deeds. Thus, not only is a deed an acceptable method (though not the only method) of imposing restrictions, it was the method originally utilized to establish the covenants in the case *sub judice*.

To contend that the subjection language of the "Key Deeds," as well as the language in the later deeds, does not impose the restrictions is to give no effect to the language and to reject that language for any purpose. In other words, appellants do not argue that the trial court should have given a different interpretation to the subjection language. In essence, they assert that the language should be discarded because the limitations in the Original Declarations, when recorded, limited their applicability to a specific earlier phase of the overall development. As we have said, generally, all circumstances surrounding the execution of a deed and all parts of the deed may be utilized in order "that every word of it may take effect and none be rejected." *Logsdon*, 143 Md. at 474, 123 A. 113.

The only interpretation of the subjection language of the "Key Deeds," and even the later deeds, is that the restrictions of the prior declarations are incorporated, exclusive of the prior limitation on applicability to the lands retained, on at least three bases: (1) the subjection language that was utilized in these deeds themselves constitute supplementary declarations of restrictions satisfying the language of the Original Declarations, even if those Original Declarations require supplementary declarations; (2) the language of the restrictions only, excluding the phase limitation language, is incorporated by reference; [12] and (3) no other interpretation makes any sense. Any other interpretation afforded to the subjection language of the "Key Deeds" would cause that language to mean nothing because the "Key Deeds" restriction language would self-destruct in light of the limitation language of the Original Declarations. It would make the "Key Deed" language meaningless and of no effect. As we earlier indicated, that construction of a deed, construing its words and phases to mean nothing, is to be avoided.

The "Key Deeds," are themselves the supplementary declarations mentioned in the Pinehurst and SanAndrew Declarations. When they subject the later lots to recorded restrictions, they are supplementary declarations. They thus satisfy the requirements of the Original Declarations that future phases be incorporated by supplementary declarations. We

---

12. While we do not so hold, we know of no legal prohibition against adopting restrictive language by clear reference to restrictive language in another instrument in the land records of a particular county—even when those other instruments are not in the instant property's chain of title and even when neither horizontal nor vertical privity exists, so long as the restrictions relate to property in the county. It may even be possible, though we do not now so hold, for a Master Declaration, so long as it relates to some property in the county, to be filed among the land records of a specific county to which subsequent conveyances of property, wherever situated in the county, can refer to by incorporating all or part of the restrictions as restrictions upon that subsequently conveyed property. In that instance, the declaration affecting title would be by supplementary declaration incorporating the subjection language in the later deeds.

do not hold, however, that a supplementary declaration was legally required, but only that, if such a requirement were legally necessary, it was met. The purpose of the limitation of the Original Declarations, initially limiting their application to the first phase, was to preserve to the developer its options to convey subsequent phases free of the restrictions, not to forbid forever the developer from subjecting future phases of the development to them. While we do not now so decide, the developer may well have been able to encumber his remaining lands with the restrictions in ways other than supplementary declarations, even though that is the method that he used.

It is not necessary that a declaration of covenants be formally titled and set out in full in every deed to every lot in a subdivision.[13] It may, as appellee has always maintained (even at the time of the *Jurgens* decision), be created by a prior deed in the chain of title. Since the Rule in *Spencer's Case*, it is not necessary that the deed creating the covenants contain the *magic* phrases, "heirs and assigns," or, "running with the land," although the "Key Deeds" in the case at bar do. Nor is it necessary, as we shall see when we discuss the general plan of development issue, that every chain of title have a "Key Deed," though all those in the case *sub judice* do; nor must such "Key Deeds" be signed by both the grantor/covenantee and the grantee/covenantor, though all those in the case at bar are two-party deeds. In any event, the "Key Deeds" and the Original Declarations involved in the case *sub judice* contain all the language mandated by the Maryland cases. Even without reference to a general scheme of development, the covenants at issue here are fully enforceable because of the express terms contained in the "Key Deeds" and by reason of the vertical privity evidenced in the chain of title to each lot.

### General Plan of Development

One of the seminal Maryland cases on this issue is the case of *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855, where, unlike

---

**13.** Such a requirement would add significant deed recording costs to the transfers of real property, a result not normally deemed desirous.

most cases involving the enforceability of subdivision restrictions, the deed conveying the property at issue there conveyed the property free of the subdivision restrictions.[14]  The plaintiffs alleged that, irrespective of the failure to include restrictions in the later deed to the defendant, they were entitled to relief because the developer had promised the plaintiff, either by express language in their earlier deed or by implication from the developer's conduct under a general plan of development, or both, that all of the land retained by him was burdened with the same restrictions he had imposed on the plaintiff's lots.  They argued that the defendant had notice of these express or implied promises and, thus, was bound to the same restrictions.  The trial court held that they had not met their burden of showing that the restrictions were for the common benefit of all those who took under deeds to the lots in the subdivision.

In *Turner*, a seventy-five lot subdivision was developed.  The first lot sold was made subject to what were then, or later become known as, the "Poplar Hill" restrictions.  All but three lots were deeded subject to the restrictions.  Many of the deeds (fifty-two), while conveyed with the restriction, did not mention the remaining lands of the developer.  In the sale of lots, almost all, if not all, of the contracts of sale included a standard phrase "subject to Poplar Hill restrictions."

There was evidence that many of the lot owners bought in reliance on the restrictions.  One of the developer's sales agents testified that the restrictions were a "selling point."  The Court held:

> It is not necessary, however, to rest our decision only on this construction of the deeds. . . .  [T]here is to be found from all the evidence, including the deeds, an intent . . . to bind all of the land in Poplar Hill by restrictions similar to those imposed. . . .  We find, too, that the appellees bought

---

14.  For foreign cases similar to *Turner, see Gulf Oil Corp. v. Fall River Housing Authority,* 364 Mass. 492, 306 N.E.2d 257, 260–61 (1974); *Teays Farms Owners Assoc., Inc. v. Cottrill,* 188 W.Va. 555, 425 S.E.2d 231 (1992).

with notice of the right of lot owners to require that this burden remain attached to the land ... even though the restrictions were not expressly imposed on the lot so sold.

... [T]here was a general plan of development of all of Sections A and B from the time sales began. Some eighteen months later, Section C was opened. The same restrictions were imposed on all lots sold ... and with the opening of Section C, all distinction between the various sections was done away with.

*Id.* at 349–50, 111 A.2d 855.

*Turner* is relevant as to the effect, if any, of language in prior instruments that limits the application of restrictive language to the specific property being conveyed and, at least facially, excludes phases of future development from those restrictions. In *Turner*, the trial court had failed to enforce the covenants as to specific lots in Section C. Initially, the property had been divided into Sections A, B, and C. Originally, only A and B were subdivided into lots. It appears from the Court of Appeals's opinion that the initial establishment of restrictions was accomplished by including the restrictions in the first lot sold in Section A and in the first lot sold in Section B. In each of those two first deeds, the grantor had included a limitation that the restrictions there imposed did not apply to his remaining land. That language is similar to that found in the Original Declarations in the case *sub judice.*

When the first lot in Section C was conveyed, it imposed the same restrictions on that lot by "incorporat[ion] by reference." Thus, the declaration creating the restrictions in Section C did so by incorporating by reference declarations of restrictions in prior documents, where those prior documents included, like the deeds containing the Original Declarations in the case at bar, language saying that they did not apply to the grantor's remaining lands. At the time the restrictions were initially directly imposed, Section C (like the lots and sections wherein appellants' properties are situate) was part of the retained property, *i.e.,* a future phase of the development. The imposition of restrictions in Section C was done in a manner substan-

tially similar to the way that it was done in the case *sub judice*—by incorporating by reference restrictions in a prior document, that by its terms, appeared to exclude Section C.

In *Belleview Construction Co. v. Rugby Hall Community Ass'n, Inc.*, 321 Md. 152, 582 A.2d 493 (1990), an instrument contained a restriction that only one dwelling could be built on a lot. The question there was whether the word "lot" meant each lot as conveyed by the developer who created the restrictions or any lot thereafter created by any resubdivision of an original lot. The Court held: "The ... covenants are covenants running with the land.... They are, by their terms, enforceable by the developer, the association, or any lot owner. The covenants were clearly established as part of a general plan of development for this community." *Id.* at 156, 582 A.2d 493. In the case at bar, the Original Declarations specifically note in their whereas clauses that their provisions are intended to be enforced by the current appellee. Other provisions empower the current appellee to "charge reasonable fees" for use of common property; create liening authority in respect to those charges in appellee; note the purposes of the assessments; create a road maintenance fund; provide the basis for determining the amount of assessments; and provide the procedure for effecting changes in assessments and charges. The Declarations further note that assessments, *in addition to being a lien* on the respective lots, shall "remain [the] personal obligation" of the owner. Moreover, they conclude by expressly affirming that each and every lot owner shall have the power, in equity or at law, to enforce the restrictions against any other lot owner. It states that its provisions shall run with and bind the land and inure to the benefit of any successors and assigns of the owners and to the benefit of appellee.

It is clear that the covenants in the case at bar, in addition to being specifically imposed in the "Key Deeds," were also intended to be part of a general plan of development for this community or communities. While the Original Declarations limited their applicability to the then extant phases of Lake Linganore, they also contained language, *i.e.*, the supplemen-

tary declaration requirement, that recognized the probability that other future phases might become subject to the effects and benefits of the restrictions. When the developer began the initial conveyancing of lots in future sections, *i.e.,* Coldstream, and made the first conveyance of lots subject to the restrictions, those sections, including the lots in the applicable section not yet conveyed, then became a part of the general plan of development of Lake Linganore and subject to the Original Declarations. All of the extrinsic evidence introduced below confirms that that is apparent from the various instruments we have discussed—the existence of a general plan of development.

Judge Rollins's concise, well-reasoned summary of the evidence is, in part, as follows:

> The intention of the original covenanting parties to bind subsequent purchasers is further evidenced by the general scheme or plan of development in Lake Linganore. In *Stewart [Steuart] Transportation v. Ashe,* 269 Md. 74, 89 [304 A.2d 788] (1973), the Court of Appeals noted that:
>
> > The intention to establish a uniform scheme or plan of development with restrictions is a matter of intention of the partes.
>
> Furthermore, the Coldstream Plat supports the common grantor's intention to apply the Covenants in Coldstream. The Coldstream record plat indicates that the LLA [Lake Linganore Association] was to own all the streets and common areas for the benefit of the lot owners and that the LLA would be responsible for the control and maintenance of these areas. The Coldstream Plats also direct the reader to "[r]efer to the Charter and Covenants of the Lake Linganore Association filed with this Plat." This language would alert any subsequent purchasers to the applicability of the Original Covenants and of the existence and authority of the LLA. This Court finds that the intent of the common grantor to apply the Covenants to the entire Coldstream Village is readily apparent from the original deeds signed by both the grantor and grantee, the general plan of development, and the Coldstream Plats.

. . . .

. . . All plaintiffs purchased their property with knowledge of the common scheme of development. The very existence of the "Lake Linganore" sign and the presence of the lakes, dam, tennis courts, pools, and other amenities put potential purchasers on notice that there was a plan of development in existence.

The position of appellants is casuistic at best. The Court in *Belleview* made a statement equally applicable to the case *sub judice:*

The interpretation urged by the association is reasonable and logical. The interpretation urged by Belleview is, at best, only remotely plausible. Indeed, it almost defies common sense. . . .

321 Md. at 159, 582 A.2d 493. In the developmental stage of the Lake Linganore development(s), its very viability (or ability of the development to continue to be what it was intended to be, and apparently is) appears to depend in large part on the ability of the development, through its association, to finance its operation. We also note the Court's referral in *Belleview* to the Florida case of *Belle Terre Ass'n v. Brosch,* 216 So.2d 462 (Fla.App.1968), *cert. denied,* 225 So.2d 529 (Fla.1969), where the Florida court commented on the result of denying enforceability of a particular covenant. That Court, addressing a similar restriction, noted what could equally apply here were we to have agreed with appellants:

If this transparent device . . . is approved, there goes the neighborhood. Thousands of Floridans who have in good faith undertaken to comply with restrictions intended for the benefit of themselves and their neighbors could no longer have confidence that some purchaser could not chop his lot up.

*Id.,* 321 Md. at 162, 582 A.2d 493. Were we to agree with appellants, the remaining lot owners in the Lake Linganore community could seriously doubt the ability of the community to finance the operation necessary to maintain that quality of living that is Lake Linganore. *See Perry v. Bridgetown*

*Community Assoc., Inc.*, 486 So.2d 1230, 1234 (Miss.1986) ("[T]his Court will consider ... also the rights of the other association members who expect maintenance in keeping with the general plan of development....") *Meadow Run and Mountain Lake Park Assoc. v. Berkel*, 409 Pa.Super. 637, 598 A.2d 1024 (1991), *alloc. denied*, 530 Pa. 666, 610 A.2d 46 (1992).[15]

In one of the important early cases involving the applicability of covenants, *Wehr v. Roland Park Co.*, 143 Md. 384, 122 A. 363 (1923), the Court noted, at 392–94, 122 A. 363:

> [T]he ... provisions were not intended for the benefit of the grantor alone, but mainly for that of the grantee and those similarly situated with him, nor were the payments to be made under the maintenance tax specifically for the benefit of the grantor, but they were to be used for the benefit of the grantees.
>
> . . . .
>
> ... [W]e have declined to limit the construction of the covenants to such an extent as to make them useless from the beginning, and to do great injustice to those who have paid what they agreed to pay.... We find no legal objection to the covenants as originally made....

When the developer begins to convey lots in new phases, making them subject to the Original Declarations, the new sections became a part of the general development. We have held that the covenants expressly apply to each of the lots of the appellants. We additionally hold that the covenants at issue are *also* enforceable as covenants that are a part of a general plan of development of which all the appellants had notice.

### 2.

### WHETHER THE CIRCUIT COURT ERRED BY ALLOWING THE INTRODUCTION OF PAROL AND OTH-

---

**15.** The appellant and appellee are wrongfully designated in the Atlantic Reporter.

ER EXTRINSIC EVIDENCE IN THE FACE OF CLEAR AND UNAMBIGUOUS COVENANTS AND WITHOUT A FINDING OF AMBIGUITY IN THOSE COVENANTS?

We recognize that appellant raised a continuing objection to all of the extrinsic evidence admitted. That objection was overruled. The court's overruling of the objection below was appropriate because the grounds proffered with the objection, i.e., that it would contradict that portion of the Original Declarations that geographically limited the applicability of the covenants, were defective. As we stated previously, the Declarations were not geographically limiting. They merely required a certain procedural formula to be followed to permit later phases of the property to be included. That formula, as we indicated, was followed. Even if it had not been followed, however, the subsequent deeds subjecting the lots to the restrictions would have been sufficient. We thus find no merit in appellants' second question.

### 4.

DID THE CIRCUIT COURT ERR IN INTERPRETING THE MARYLAND CONTRACT LIEN ACT AS BEING APPLICABLE? DID THE CIRCUIT COURT ERR IN DISALLOWING APPELLANTS AN AWARD OF ATTORNEY'S FEES?

#### a. Attorney's fees

■ We answer the second question first. Appellants argue in their brief:

Considering that Appellants should have prevailed below ..., Appellants respectfully submit that the denial of their request for attorney's fees was in error.[16]

---

16. Appellants based their request on the provisions of Section 14–203(i)(2) of the Real Property Article which permits a trial court to award fees and costs "to any party...."

Appellants' premise is wrong. Appellants did not and should not have prevailed below. The trial court neither erred nor abused its discretion in declining to award attorney's fees.

### b. The Contract Lien Act

■ The Maryland Contract Lien Act (Act), codified in Md. Code (1974, 1988 Repl.Vol.), Title 14, Subtitle 2 of the Real Property Article, provides, in relevant part, as follows:

§ 14–201. Definitions

. . . .

(b) *Contract.*—(1) "Contract" means a real covenant running with the land *or* a contract recorded among the land records . . . .

§ 14–202. Creation . . . .

(a) *In general.*—A lien on property may be created by a contract and enforced . . . if:

(1) The contract expressly provides for the creation of a lien; and

(2) The contract expressly describes:

(i) The party entitled to establish and enforce the lien; and

(ii) The property against which the lien may be imposed.

. . . .

§ 14–203 . . . .

. . . .

(d) . . . [T]he party seeking to establish the lien has the burden of proof. [1995 Cum.Supp.]

§ 14–204 . . . .

(a) . . . A lien may be enforced and foreclosed by the party who obtained the lien . . . . [Emphasis added.]

The Original Declarations (the "Pinehurst" Declaration and "SanAndrew" Declaration) were imposed on appellants' lots through the supplementary declarations contained in the "Key Deeds." In their initial whereas clauses, the Declarations provide:

WHEREAS, Declarant desires ... to subject the real property ... in Article I, *together with such additions as may ... be made thereto,* to the ... charges and liens hereinafter set forth....

WHEREAS, Declarant has deemed it desirable ... to create an agency to which should be delegated and assigned the powers of ... collecting ... the assessments and charges hereinafter created; and

WHEREAS, Declarant has incorporated ... LAKE LINGANORE CORPORATION, INC. for the purpose of exercising the functions aforesaid....

Thereafter, in their bodies, the Declarations described the property that was to be subjected thereto and, through the supplementary declaration in the "Key Deeds," included all of the property of the respective appellants. Therefore, the Original Declarations (as supplemented) contained a covenant by appellants' predecessors in title that they agree to pay the annual assessments and charges. The Declarations declared that all such assessments "shall be and remain a first lien upon each lot" and "[i]f the assessment is not paid ... the Association may being an action at law ... to foreclose the lien against the property...."

Appellants argue in their brief that the Association failed to show that existence of a "Contract" binding the Appellants to the authority of the [Association]. Because neither the Pinehurst nor the SanAndrew Declarations apply to their lots, Appellants simply have no obligation, contractual or otherwise, under the Act to pay LLA assessments.

Appellants are simply *wrong.*

In *Chesapeake Ranch Club, Inc. v. Garczynski,* 71 Md.App. 224, 524 A.2d 805 (1987), lot owners challenged assessments imposed by a similar homeowners association. The trial court there held "that the act applies to condominium property only" and ordered that the Act did not apply to the imposition of liens on non-condominium property under covenants running with the land. *Id.* at 226, 524 A.2d 805. The late Judge

Pollitt for this Court rendered a clear and concise opinion discussing why the Act did apply. We there held, in reversing the trial court:

> The language of the statute is clear and unambiguous....
>
> ....
>
> We hold that the Act is applicable to the lien attempted to be imposed by appellant on the land of appellees.

*Id.* at 228–29, 524 A.2d 805 (footnote omitted).

We perceive no error on the part of Judge Rollins in applying the Contract Lien Act in the case *sub judice.*

## 5.

DID THE TRIAL COURT ERR AS A MATTER OF LAW IN ENTERING A PERSONAL JUDGMENT AGAINST THE IZADIS ARISING OUT OF THE DECLARATION'S LIEN PROVISIONS BASED UPON THE THEORY OF QUANTUM MERIT?

■ Because the original claims set forth in the Association's Amended Complaint, after a District Court collection case against the Izadis was consolidated with the instant case, clearly proffered the contract claims and the quantum meruit claims as alternate theories supporting the collection of but a single sum allegedly due, we do not address the interesting and potentially important issue of whether quantum meruit claims can arise out of these types of developmental declarations, independent of the Contract Lien Act or other contract theories. The Association in the case at bar sought a judgment on an either/or basis. When the Izadis' lien was established, the Association received all that it had requested. When Judge Rollins, in his amended order, added the quantum meruit judgment, he was actually duplicating the previous order establishing a lien in the identical sum. Thus, that quantum meruit judgment should not have been entered.

In light of our resolution above, we need not address any other issues. For the reasons we have extensively furnished, we shall affirm all aspects of Judge Rollins's decision, save the

quantum meruit judgment against the Izadis.[17]  We shall assess all costs against appellants.

In conclusion, we note that Judge Rollins's conduct of these proceedings and his opinion resulting from it displayed a complete knowledge of the principles of real property law applicable here.  He performed a complex and difficult judicial function exceptionally well.  In doing so, he laid to rest what apparently has been an ongoing battle within this particular community over the covenants.  These covenants apply!

**JUDGMENT ENTERED AGAINST MOHAMMED AND CYNTHIA IZADI FOR $1,002.51 ON "BREACH OF CONTRACT QUANTUM MERUIT" GROUNDS VACATED; THE IMPOSITION OF A LIEN IN THE AMOUNT OF $1,002.51 AGAINST THE PROPERTY OF MOHAMMED AND CYNTHIA IZADI IS AFFIRMED; THE JUDGMENT IS OTHERWISE AFFIRMED IN ITS TOTALITY; COSTS TO BE ASSESSED AGAINST APPELLANTS.[18]**

---

17.  Judge Rollins's opinion and order did not address the quantum meruit issue (it was barely raised before him, if at all).  It was only in his amended order, when he actually assessed the lien against the Izadis, that he additionally rendered the quantum meruit judgment against them.

18.  We do not discuss the theory of equitable servitudes, enforceable in equity.  We note, nonetheless, that these fees were also equitable servitudes enforceable in equity.  *See King v. Waigand,* 208 Md. 308, 311, 117 A.2d 918 (1955); *Coomes v. Aero Theatre and Shopping Center, Inc.,* 207 Md. 432, 437, 114 A.2d 631 (1955); *Levy v. Dundalk Co.,* 177 Md. 636, 645, 11 A.2d 476 (1940); *McKenrick,* 174 Md. at 128, 197 A. 580; *Meade v. Dennistone,* 173 Md. 295, 303, 196 A. 330 (1938) (". . . Nor is it necessary . . . that there should be privity of estate . . . but there must be found somewhere the clear intent to establish the restriction for the benefit of the party attempting to restrain its infringement"); *Dawson v. Western Maryland Railroad Co.,* 107 Md. 70, 89, 68 A. 301 (1907); *Peabody Heights Co. v. Willson,* 82 Md. 186, 201, 32 A. 386 (1895); *Newbold v. Peabody Heights Co.,* 70 Md. 493, 502, 17 A. 372 (1889).